# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| NCR VOYIX CORPORATION<br><br>        *Plaintiff,*<br><br>v.<br><br>AT&T ENTERPRISES, LLC,<br>f/k/a AT&T CORP.<br><br><br>        *Defendant.* | **VERIFIED COMPLAINT SEEKING PRELIMINARY INJUNCTION IN AID OF ARBITRATION**<br><br>Case No. _____ |

Plaintiff NCR Voyix ("NCR" or "Plaintiff"), by its undersigned counsel, for its Verified Complaint Seeking Preliminary Injunction in Aid of Arbitration ("Complaint") against Defendant AT&T Enterprises, LLC, f/k/a AT&T Corp. ("AT&T" or "Defendant" and together with NCR, "the Parties") alleges, with knowledge with respect to its own acts and publicly available information and on information and belief as to other matters, as follows:

## **INTRODUCTION**

1.     This is an action for preliminary injunctive relief in aid of arbitration under New York law.  As provided by agreement between the Parties, NCR will commence a New York-seated arbitration against AT&T for breach of contract seeking, among other things, specific performance of AT&T's contractual obligations.  By this Complaint, Plaintiff respectfully requests that this Court enter a preliminary injunction to prevent irreparable harm to NCR and preserve the Parties' pre-dispute contractual *status quo* until the to-be-appointed arbitrator can award Plaintiff effective relief.

2.      Since 1996, when AT&T decided to spin off NCR as an independent company, the Parties' relationship has been governed by the Separation and Distribution Agreement, dated February 1, 1996 and Amended and Restated as of March 29, 1996 ("SDA") (attached hereto as **Exhibit 1**).  Pursuant to the SDA, AT&T is contractually obligated to indemnify NCR for certain liabilities that accrued prior to the spin-off.  As relevant here, AT&T's indemnification obligation under the SDA requires it to reimburse NCR for 37% of costs in excess of $100 million that NCR incurs related to its ongoing environmental remediation of the Kalamazoo River in Michigan ("Kzoo River"), which NCR is required to perform pursuant to NCR's consent decree with the United States and the State of Michigan ("Kzoo River Consent Decree").

3.      AT&T does not dispute that obligation.  AT&T performed under this contract for nearly a decade, and has paid NCR's quarterly invoices for Kzoo River remediation work for years.  Then, in December 2025, after failing to remit payment on two validly issued invoices requiring AT&T to pay NCR over $8 million, AT&T notified NCR that it is halting all past due and future payments on its contractually obligated indemnity of ongoing Kzoo River remediation work.  Its sole reason for doing so:  to create negotiating leverage over NCR—a company with a fraction of AT&T's resources—in order to extract an unmerited refund on *past* invoices, for costs *unrelated* to those reflected in the invoices that AT&T refuses to pay, without going through the dispute resolution mechanism provided for in the SDA.  Such self-help in circumvention of said dispute resolution procedures is squarely addressed in and prohibited by the SDA, which states that the Parties "will continue to provide service and honor all other commitments under this Agreement . . . during the course of dispute resolution . . . with respect to all matters not subject to such dispute, controversy or claim."  (SDA § 9.9.)

4.      In refusing reimbursement, AT&T has imposed significant pressure on NCR at a time when, as AT&T is well aware, NCR cannot afford to lose these payments.

5.      AT&T's breach is causing—and, absent this Court's intervention, will continue to cause—NCR irreparable harm.  Indeed, the Parties stipulated to that fact when they negotiated the SDA's indemnification scheme, and AT&T expressly waived its right to argue otherwise.  As the SDA plainly provides, the parties "*shall have the right to specific performance and injunctive or other equitable relief* of its rights under this Agreement . . . . [and] agree that the remedies at law for any breach or threatened breach, including monetary damages, *are inadequate compensation for any loss* and that *any defense in any action for specific performance that a remedy at law would be adequate is waived*."  (*Id.* § 12.13 (emphases added).)

6.      The facts bear that stipulation out.  As NCR has explained to AT&T in the context of this dispute, NCR's business is at a critical inflection point:  it has sizeable debt while undergoing a strategic shift in operational focus, and its financial future depends on the successful execution of this transition.  NCR cannot currently afford to divert millions in cash away from ongoing business operations to fund liabilities that stem from legacy businesses and that AT&T is contractually obligated to pay.  Yet that is precisely what AT&T is trying to bring to pass.

7.      As a result of AT&T's nonpayment, NCR has already been forced to deplete capital resources intended for its ongoing business operations in order to perform its obligations under the Kzoo River Consent Decree; and it will continue to have to divert resources or accumulate debt with each unpaid invoice.  This increased debt risks a downgrade to NCR's credit rating (which is already below investment grade) during a time when NCR is likely to access the capital markets to refinance its debt in connection with its ongoing restructuring.  Any

downgrade to NCR's credit rating will make accessing the capital markets more difficult and impede its ability to fund the ongoing remediation work on the Kzoo River.

8.      NCR promptly escalated the dispute, in the hope that AT&T's blatant breach was mere posturing and could be quickly resolved; alas, on January 26, 2026, at an escalation meeting between the Parties' executives, AT&T doubled down on its position, making clear that no payments would be forthcoming, notwithstanding AT&T's clear contractual obligations and the irreparable harm that AT&T's actions are causing to NCR.

9.      This Court has jurisdiction to enter a preliminary injunction in aid of arbitration in order to avoid this irreparable harm to NCR and preserve an arbitrator's ability to award effective relief.  And while NCR has initiated the dispute resolution process pursuant to the SDA and will serve an arbitration demand seeking specific performance of AT&T's contractual obligations, NCR cannot wait for an arbitrator to award relief from AT&T's breach without suffering irreparable harm in the meantime.  That harm may well force NCR to capitulate to AT&T before the issue of breach can be arbitrated.  Accordingly, for the reasons set forth below, and as explained in NCR's contemporaneously-filed motion for entry of a preliminary injunction in aid of arbitration, the Court should order AT&T to resume its contractually-required indemnification payments under the SDA until the underlying dispute between the Parties is resolved through arbitration or otherwise.

## PARTIES

10.      Plaintiff NCR is a corporation organized under the laws of the State of Maryland, with its principal place of business in Atlanta, Georgia.  Today, its primary business is the provision of digital commerce solutions, offering platform-based software and services for retailers and restaurants, as well as payment acceptance solutions, self-checkout kiosks and related technologies.  In 2024, NCR reported annual revenue of approximately $2.8 billion.

11.     Defendant AT&T is a limited liability company organized under the laws of the State of Delaware.  Upon information and belief, AT&T was formed in 2023 as part of a corporate reorganization in which AT&T Corp. merged with AT&T Enterprises, Inc., with AT&T Enterprises, Inc. as the surviving entity, with AT&T Enterprises, Inc. then being converted into a limited liability company.  AT&T succeeded AT&T Corp. with respect to AT&T Corp.'s rights and obligations under the SDA.

12.     AT&T's sole member is AT&T Wireline Holdings, LLC, a Delaware limited liability company.  AT&T Wireline Holdings, LLC's sole member is AT&T DW Holdings, Inc., a corporation organized under the laws of the State of New York with its headquarters in New York, New York.

13.     AT&T operates as an indirect wholly owned subsidiary of AT&T, Inc., a global leading provider of telecommunications and technology services.  In 2024, AT&T, Inc. reported annual revenue of approximately $122.3 billion.

## JURISDICTION AND VENUE

14.     This is an action for preliminary injunctive relief in aid of arbitration pursuant to Federal Rule of Civil Procedure 65(a).

15.     This Court has subject matter jurisdiction over NCR's state law claim(s) pursuant to 28 U.S.C. § 1332 based on the complete diversity of citizenships of Plaintiff NCR, on the one hand, and of Defendant AT&T, on the other, and the amount in controversy exceeding $75,000, exclusive of interest and costs.

16.     This Court has personal jurisdiction over Defendant because:

- AT&T is registered in and is authorized to do business in the State of New York under the fictitious name AT&T Enterprises New York, LLC.  Upon information and belief, AT&T has one or more offices located in New York.

- Through its business operations and resulting commercial flows, AT&T has engaged in sufficient minimum contacts with New York and has purposefully availed itself of the benefits and protections of New York law, such that the exercise of jurisdiction over AT&T comports with due process requirements.

- AT&T is a party to the SDA. The SDA provides that "all disputes, controversies or claims (whether sounding in contract, tort or otherwise) that may arise out of or relate to" the SDA shall be resolved through arbitration, and the place of such arbitration will be New York, New York. (*Id.* §§ 9.1, 9.4(e).) As such, AT&T has consented to personal jurisdiction in New York courts. *Merrill Lynch, Pierce, Fenner & Smith v. Shaddock*, 822 F. Supp. 125 (S.D.N.Y. 1993).

- As a party to the SDA, AT&T has further agreed that the "[SDA], and, unless expressly provided therein, each Ancillary Agreement, shall be governed by and construed and interpreted in accordance with the laws of the State of New York . . . irrespective of the choice of law principles of the State of New York, as to all matters, including matters of validity, construction, effect, enforceability, performance and remedies." (SDA § 12.2.) Such choice-of-law provision reinforces AT&T's affiliation with New York and the reasonable foreseeability of litigation there.

17.    Venue is also proper in this district pursuant to 28 U.S.C. § 1391. AT&T has consented that venue is appropriate by agreeing to arbitrate any SDA-related disputes in New York, New York under New York law. *See Doctor's Assocs. v. Stuart*, 85 F.3d 975, 983 (2d Cir. 1996).

## STATEMENT OF FACTS

### I.    The SDA Requires that AT&T Indemnify NCR for 37% of Kzoo River Remediation Costs In Excess of $100 Million.

18.    In 1991, following a hard-fought takeover battle, AT&T acquired NCR's predecessor company, National Cash Register Corp. ("NCR Corp."), in a deal valued at approximately $7.5 billion. Five years following that merger, AT&T spun-off NCR Corp., and in 2023, the company changed its name to NCR Voyix. The terms of that spin-off transaction were set forth in the SDA, which provides the Parties' respective liabilities following the transaction.

19.     Among other things, the SDA established a comprehensive scheme for sharing future costs incurred by either Party as a result of unknown liabilities that accrued prior to the spin-off transaction.  (*See* SDA § 6.1.)  Section 6.1 defines such "Contingent Liabilities" as:

> [A]ny Liability, other than Liabilities for Taxes (which are governed by the Tax Sharing Agreement), of AT&T, Lucent, NCR or any of their respective Affiliates, whenever arising, to any Person other than AT&T, Lucent, NCR or any of their respective Affiliates, if and to the extent that (i) such Liability has accrued of the Closing Date (based on then existing law) and (ii) the existence or scope of the obligation of AT&T, Lucent, NCR or any of their respective Affiliates as of the Closing Date, with respect to such Liability was not acknowledged, fixed or determined in any material respect, due to a dispute or other uncertainty as of the Closing Date, or as a result of the failure of such Liability to have been discovered or asserted as of the Closing Date . . . .

(*Id.* § 6.1(c).)  The "Closing Date" is in turn defined as the date of the initial public offering of Lucent Technologies Inc. (another business that was spun-off by AT&T at this time)—*i.e.*, April 4, 1996.  (*Id.* § 1.26.)

20.     The allocation for Contingent Liabilities depends in part on whether the liability is "exclusive," *i.e.*, it primarily relates to one Party's business or is expressly assigned to one Party pursuant to the SDA.  As relevant to this dispute, the SDA provides for a specific cost allocation for "Exclusive NCR Contingent Liabilities," which Section 6.1(k) defines as:

> [A]ny Contingent Liability . . .  if such Contingent Liability primarily relates to any NCR Business, including the matters listed or described on Schedule 6.1(g) (as supplemented pursuant to Section 6.6(d)) hereto, or if such Contingent Liability is expressly assigned to NCR pursuant to this Agreement or any Ancillary Agreement.

(*Id.* § 6.1(k).)

21.     For Exclusive NCR Contingent Liabilities, NCR "shall be" entitled to reimbursement from AT&T for 37% of costs in excess of $100 million ("Excess Portion"):

> Notwithstanding anything to the contrary in this Agreement, except as set forth in paragraph (f) of this Section 6.3, if the aggregate Value of all amounts paid by AT&T, Lucent or NCR (in each case, together with any members of its respective Group) in respect of any single Exclusive Contingent Liability of such Group or

7

any Related Exclusive Contingent Liabilities of such Group is in excess of $100 million, each of AT&T, Lucent or NCR, as the case may be, *shall be entitled to reimbursement from each of the others for a share of the Excess Portion* in accordance with the following percentages: . . . [I]n the case of Exclusive NCR Contingent Liabilities, NCR shall bear 50 percent of such Excess Portion, *AT&T shall bear 37 percent of such Excess Portion* and Lucent shall bear 13 percent of such Excess Portion[.]

(*Id.* § 6.3(b)(ii) (emphases added).)

22.     Section 6.1(l)(ii) specifies that Exclusive Contingent Liabilities subject to such reimbursement include "Environmental Liabilities." (*Id.* § 6.1(l)(ii).) "Environmental Liabilities" are defined as follows:

[A]ll Liabilities relating to, arising out of or resulting from any Environmental Law or contract or agreement relating to environmental, health or safety matters (including all removal, remediation or cleanup costs, investigatory costs, governmental response costs, natural resources damages, property damages, personal injury damages, costs of compliance with any settlement, judgment or other determination of Liability and indemnity, contribution or similar obligations) and *all costs and expenses* (*including allocated costs of in-house counsel and other personnel*), interest, fines, penalties or other monetary sanctions in connection therewith.

(*Id.* § 1.41 (emphasis added).)

23.     The SDA expressly provides that objections to the "quality or manner" of the defense mounted against an Exclusive Contingent Liability shall not excuse any party's obligation to pay its share of the Excess Portion.  Pursuant to Section 6.3(e):

It *shall not be a defense to any obligation by any party to pay any amount in respect of any Excess Portion* that such party was not consulted in the defense thereof, that such party's views or opinions as to the conduct of such defense were not accepted or adopted, *that such party does not approve of the quality or manner of the defense thereof* or that such Excess Portion was incurred by reason of a settlement rather than by a judgment or other determination of liability (even if, subject to Section 5.5(g), such settlement was effected without the consent or over the objection of such party).

(*Id.* § 6.3(e) (emphasis added).)

24.     Exclusive NCR Contingent Liabilities that are not paid within 30 days "shall bear interest at the Prime Rate plus 2% per annum."  (*Id.* § 6.5(c).)

25.     The Parties also set forth a framework for resolving any disputes arising out of or relating to the SDA.  The SDA requires arbitration of "all disputes, controversies or claims." (*Id.* § 9.1.)  Pursuant to Section 9.1 of the SDA:

> Except as otherwise specifically provided in any Ancillary Agreement, the procedures for discussion, negotiation and arbitration set forth in this Article IX *shall apply to all disputes, controversies or claims (whether sounding in contract, tort or otherwise) that may arise out of or relate to, or arise under or in connection with this Agreement* or any Ancillary Agreement, or the transactions contemplated hereby or thereby . . . .

(*Id.* (emphasis added).)  "The place of any arbitration [pursuant to Article IX of the SDA] will be New York, New York, unless otherwise agreed by the parties."  (*Id.* § 9.4.)

26.     As part of the dispute resolution process, however, the SDA explicitly allows a party to seek interim remedies in court:

> Prior to the time at which an arbitrator is appointed pursuant to Section 9.4, *any party may seek one or more temporary restraining orders in a court of competent jurisdiction if necessary in order to preserve and protect the status quo.*  Neither the request for, or grant or denial of any such temporary restraining order shall be deemed a waiver of the obligation to arbitrate as set forth herein and the arbitrator may dissolve, continue or modify any such order.  Any such temporary restraining order shall remain in effect until the first to occur of the expiration of the order in accordance with its terms or the dissolution thereof by the arbitrator.

(*Id.* § 9.7(b) (emphasis added).)

27.     The Parties also specifically contracted for the right to compel one another to comply with *any* of their obligations under the SDA—including their obligations to reimburse one another for Contingent Liabilities.  Section 12.13 of the SDA, titled "Specific Performance," provides:

> In the event of *any* actual or threatened default in, or breach of, *any* of the terms, conditions and provisions of this Agreement or any Ancillary Agreement, the party or parties who are or are to be thereby aggrieved *shall have the right to*

9

> *specific performance and injunctive or other equitable relief* of its rights under this Agreement or such Ancillary Agreement, in addition to any remedies at law or in equity, and all such rights and remedies shall be cumulative.  The parties agree that *the remedies at law for any breach or threatened breach, including monetary damages, are inadequate compensation for any loss* and that *any defense in any action for specific performance that a remedy at law would be adequate is waived*.

(*Id.* § 12.13 (emphases added).)

28.     Critically, in the event of a dispute, the SDA requires the Parties to continue to "honor all other commitments under this Agreement."  (*Id.* § 9.9.)  The SDA's "Continuity of Performance" provision states in full:

> Unless otherwise agreed in writing, the parties will continue to provide service and *honor all other commitments under this Agreement* and each Ancillary Agreement during the course of dispute resolution pursuant to the provisions of this Article IX with respect to all matters not subject to such dispute, controversy or claim.

(*Id.* § 9.9 (emphasis added).)  In other words, the Parties expressly agreed that a dispute as to *one* obligation under the SDA does not absolve the fulfillment of any *other* SDA obligations.  And there is no provision of the SDA that allows for self-help withholding of payments in the event of a dispute.

29.     The SDA is governed by, construed, and interpreted in accordance with New York law (aside from its laws of arbitration) "as to all matters, including matters of validity, construction, effect, enforceability, performance and remedies."  (*Id.* § 12.2.)

## II.    NCR Enters into Consent Decrees Related to Its Legacy Business.

30.     Between 2008 and 2020, NCR was involved in series of complex litigations regarding its alleged role in the discharge of polychlorinated biphenyls ("PCBs")—a chemical widely used in manufacturing through the 1970s but now banned in the United States—into the Fox River in Wisconsin and the Kzoo River in Michigan.

31.     In early 2011, an Eastern District of Wisconsin court ruled on summary judgment that NCR is 100% responsible (and dozens of other companies are 0% responsible) for cleaning up most of the Fox River (everywhere downstream of a facility an NCR predecessor had owned), exposing NCR to billions of dollars in liability related to the Fox River site, as well as potentially at other sites, including the Kzoo River.  *See Appleton Papers, Inc., et al. v. George A. Whiting Paper Co. et al.* ("*Whiting*"), 776 F. Supp. 2d 857, 860 (E.D. Wis. 2011).

32.     NCR retained Cravath, Swaine & Moore LLP ("Cravath") to challenge that finding.  With Cravath serving as its lead counsel on all Fox River (and Kzoo River) litigation matters from that point forward, NCR managed to drastically reduce its exposure.  Following trial regarding the unresolved upstream area, the court ruled that NCR was not liable as an "arranger" for the disposal of hazardous waste.  *See Appleton Papers Inc. v. George A. Whiting Paper Co*., No. 08-C-16, 2012 WL 2704920 at *13 (E.D. Wis. July 3, 2012), *aff'd sub nom. NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682 (7th Cir. 2014).  That trial decision was affirmed on appeal, and the Seventh Circuit vacated the district court's earlier summary judgment ruling that had held NCR 100% responsible for cleanup of all downstream areas.  *See NCR Corp.*, 768 F.3d at 713.

33.     Meanwhile, extensive litigation ensued with respect to the Kzoo River, where again multiple parties sought to hold NCR solely responsible for all remediation.  Cravath represented NCR in two trials and several appeals in that action as well, with the Western District of Michigan ultimately finding that NCR was not the sole responsible party.  *See Georgia-Pacific Consumer Products LP v. NCR Corp.*, 358 F. Supp. 3d 613, 618 (W.D. Mich. 2018).

34.     All told, the Fox River and Kzoo River litigation matters involved countless motions and briefs, four trials, various injunction proceedings, multiple rounds of appeals,

arbitration proceedings to resolve related indemnification issues, and many issues of first impression. Although this lengthy, complex litigation was costly, it ultimately saved NCR (and AT&T) billions of dollars by allocating liability to multiple other parties.

35.     As a result of the substantially stronger position Cravath helped NCR secure, NCR eventually resolved its liability for the Fox and Kzoo Rivers by entering into Consent Decrees, with AT&T's full knowledge and consent.

36.     In 2017, NCR entered into the Fox River Consent Decree with the United States and the State of Wisconsin. *See United States v. NCR Corp.*, No. 1:10-cv-910, 2017 WL 3668771, at *15 (E.D. Wis. Aug. 23, 2017). In 2019, NCR entered into the Kzoo River Consent Decree with the United States and the State of Michigan (together with the Fox River Consent Decree, the "Consent Decrees"). *See United States v. NCR Corp.*, No. 1:19-cv-1041, 2020 WL 8574835 (W.D. Mich. Dec. 2, 2020).

37.     These Consent Decrees require NCR, among other things, to perform remediation work to remove PCBs in certain segments (or "operational units") of the Fox and Kzoo Rivers. NCR completed its obligations under the Fox River Consent Decree in 2022. Its obligations under the Kzoo River Consent Decree are ongoing and expected to last years.

38.     Pursuant to the Kzoo River Consent Decree, NCR is responsible for the remediation of three segments of the Kzoo River. The U.S. Environmental Protection Agency ("EPA"), which oversees NCR's remediation efforts, designated one of NCR's segments as a "time critical removal action"—meaning the area is affected by "conditions presenting imminent and substantial endangerment" that require timely and consistent remediation.

39.     Thus far, the EPA has allowed NCR to prioritize this "time critical" river segment ahead of its work on the remaining operational units, rather than requiring NCR to remediate all

three operational units simultaneously.  But the EPA, in consultation with other federal and state regulators, maintains discretion over the timing of, and specific requirements for, NCR's completion of its work under the Kzoo River Consent Decree.

40.     NCR's remediation work under the Kzoo River Consent Decree is a significant undertaking.  It requires NCR to underwrite and manage an expansive project involving extensive engineering work and construction in order to dredge the river, stabilize the riverbank, and dispose of waste.  The workforce consists of hundreds of contractors (and sub-contractors), construction workers, technical specialists, and environmental experts, all of whom require timely payment for their work to ensure each phase of the iterative cleanup process occurs on schedule.  In total, the cost to remediate the areas assigned to NCR is projected to be over half a billion dollars without payment from NCR's indemnitors.  While that number is substantial, particularly for a company of NCR's size, it is approximately one-fourth of the projected $1.8 billion in costs to remediate the entire Kzoo River (*i.e.*, costs that NCR was potentially on the hook for prior to engaging Cravath).

41.     The Kzoo River Consent Decree outlines "Stipulated Penalties" for any unexcused failure by NCR to comply with its obligations.  In addition to financial penalties, the United States and State of Michigan expressly reserve the right "to seek any other remedies or sanctions available" for a violation.  Although the United States and State of Michigan each covenanted "not to sue or to take administrative action against" NCR under the agreement, "[t]hese covenants are conditioned upon the satisfactory performance by [NCR] of its obligations" under the Kzoo River Consent Decree.  Consequently, either the federal or state government can reopen enforcement proceedings against NCR should it fall behind on remediation, even if such delay is caused through no fault of NCR.

**III.    NCR Is Undergoing a Business Transition.**

42.    In 2023, NCR began strategically transforming its business to focus exclusively on the provision of platform-led software and services—a departure from its history as primarily a provider of *hardware*-based digital commerce solutions.  This included spinning off and selling its former ATM-focused banking business and its digital banking segment; and outsourcing the design and manufacture of its self-checkout and point-of-sale hardware businesses to a third-party.

43.    NCR's strategic transformation has required the company to make significant (and costly) investments.  In 2023 and 2024, NCR spent approximately $28 million and $125 million, respectively, in transformation and restructuring costs.  In 2024, NCR also spent approximately $48 million on strategic initiatives (which includes costs incurred related to its hardware business transition).  As NCR explained in its 2024 Annual Report:  "To support our growth, we expect to continue to spend capital and may need to increase our capital expenditures to enhance our products and platform capabilities. . . . The development process can be lengthy and costly, and requires us to commit a significant amount of resources to bring our business solutions to market."  During the first three quarters of 2025, NCR spent another $84 million in transformation and restructuring costs.

44.    NCR also continues to incur annual research and development costs in order to keep pace with technological advancements and remain competitive with its peers.  As NCR disclosed in its 2024 Annual Report:

> We remain focused on designing and developing solutions that anticipate our customers' evolving needs and consumer preferences.  Our expenses for research and developments were $157 million in 2024, $139 million in 2023, and $116 million in 2022.  We anticipate that we will continue to have significant research and development expenditures in the future to provide a continuing flow of innovative, high-quality products and services and to help maintain and enhance our competitive position.

45.    In its Quarterly Report for the third quarter of 2025, NCR reported approximately $1.1 billion of total indebtedness outstanding, a level of debt that could "require [it] to dedicate a substantial portion of [its] cash flow to the payment of principal and interest, thereby reducing the funds available for operations and future business opportunities."

46.    Although NCR expects that such critical investments will yield long-term strategic dividends, it has acknowledged that this transformation is not without risk.  Among these risks, NCR disclosed in its 2024 Annual Report:

- "If we do not successfully develop new solutions that achieve market acceptance and keep pace with technological developments, our business, results of operations and financial condition could be harmed."

- "If we are not successful in attracting customers to our platform, expanding our customer base at the rate that we anticipate, or if the costs to complete these initiatives is higher than anticipated, we may not meet our growth and gross margin projections, and operating results could be negatively impacted."

- "Our success depends in part on our ability to develop new or sufficiently differentiated solutions and introduce enhancements to our product offerings on a timely and cost-effective basis."

- "Our sales are highly dependent on our business reputation and on positive recommendations from our existing customers.  Any failure to maintain high-quality customer support, or a market perception that we do not maintain high-quality customer support, could adversely affect our reputation and brand . . . and our business, financial condition, or results of operations."

- "As part of our growth strategy, we have undertaken and may undertake in the future cost reduction actions in order to reduce costs.  We may not obtain the anticipated cost savings or operational improvements or realize the benefits that were anticipated in connection with these initiatives within the projected timing or at all.  Further, such benefits may be realized later than expected, and the difficulties in implementing these measures may be greater than anticipated, which could cause us to incur additional costs or result in business disruptions."

47.     While in the midst of this critical transition, NCR is bearing AT&T's share of the cost of a half-billion-dollar project to remediate its assigned areas of the Kzoo River—work that has nothing to do with NCR's current business and does not earn the company any revenue.

**IV.    For Over a Decade, AT&T Complies With Its Payment Obligations, Despite Disputes Regarding Past Invoices.**

48.     By November 2012, NCR had met the SDA's $100 million threshold for the Fox River site.  Pursuant to the SDA, NCR then began invoicing AT&T for its 37% share of additional costs incurred by NCR.

49.     Beginning in 2013, AT&T began to voice certain concerns regarding the Fox River invoices.  AT&T raised two concerns in particular:  (i) AT&T took issue with certain Cravath legal fees incurred by NCR in mounting its defense against liabilities relating to the Fox River, and requested supporting documentation for such fees; and (ii) AT&T claimed that NCR failed to net out on its invoices certain tax benefits associated with its liabilities on the Fox River.

50.     For over a decade, as these invoices were being issued, NCR engaged in good faith with AT&T to try to resolve its disputes.  This included providing detailed backup for the Cravath legal fees (to which AT&T has not objected).

51.     Throughout this period, AT&T continued to pay what it owed on the Fox River invoices.  Overall, AT&T paid 28 Fox River invoices in full by February 2024—representing all principal costs for the Fox River liability.  The only Fox River invoice outstanding is for interest that accumulated on late payments, pursuant to Section 6.5(c) of the SDA.

52.     By April 2023, NCR had met the $100 million threshold for liabilities arising out of the Kzoo River site, and began invoicing AT&T for its 37% share of the costs it incurred above that threshold.  Between April 2023 and April 2025, NCR issued ten Kzoo River invoices to AT&T, reflecting over $233.5 million in Kzoo River remediation-related costs (together with

the Fox River invoices, the "Past Invoices"). Only two of these invoices, Invoice No. Kzoo-01 and Invoice No. Kzoo-06, included additional Cravath legal fees incurred in the Kzoo River litigation, totaling approximately $67 million. AT&T paid all ten of these Kzoo River invoices in full.

53. During this time period, as with the Fox River invoices, AT&T raised concerns about the proper calculation of NCR's tax benefit for Kzoo River remediation work, and requested more detailed documentation for the Cravath legal fees reflected on Kzoo River invoices (namely, Invoice No. Kzoo-01). As with the Fox River invoices, NCR worked with AT&T in good faith to resolve AT&T's concerns and respond to its inquiries.

54. In January 2025, AT&T's counsel wrote to NCR with a request for additional documentation and responses to certain questions regarding the Kzoo River invoices that had been issued as of that date. On March 7, 2025, NCR responded to AT&T's questions in writing and provided the requested documentation, including NCR's complete set of Cravath invoices, as NCR had received them. NCR did not hear anything further from AT&T with respect to documentation of Cravath legal fees for the Kzoo River matter until *after* AT&T had repudiated its payment obligations under the SDA. (*See infra* ¶ 66.)

55. On June 12, 2025, the Parties entered into an agreement resolving their dispute as to the proper calculation of NCR's tax benefit for Kzoo River remediation work. Specifically, the Parties agreed that the tax benefit to be netted from Kzoo River invoices should reflect the actual economic value to NCR as a result of expenses related to the Kzoo River site. This agreement reflected the Parties' shared understanding that tax benefits should reflect the actual economic benefit to NCR, rather than being based on publicly reported effective tax rates. The Parties also agreed to bifurcate the dispute as to calculation of the tax benefit for Fox River

matters—which were handled by NCR's legacy business, prior to the spin-off of its ATM-focused business (*supra* ¶ 42)—and Kzoo River matters—which have been handled by NCR in its present form. That decision was made due to the difference in how NCR's tax benefit is calculated between the old and new corporate structure.

## V.    AT&T Stops Paying Kzoo Remediation Invoices and Repudiates Its Obligations Under the SDA.

56.    On July 23, 2025, AT&T's counsel "proposed" that in order to resolve AT&T's outstanding objections regarding the Past Invoices, NCR should "halt[] future Kalamazoo invoicing to AT&T for SDA cost-sharing until NCR has incurred" an additional $123 million in expenses pursuant to the Kzoo River Consent Decree ("July Demand").

57.    AT&T claimed in the July Demand that the $123 million write-off reflected:  (i) a proposed write-off by NCR of $38 million of the $46 million in tax benefits AT&T claimed NCR had gained for Fox River remediation work; and (ii) a proposed write-off for $85 million in disputed legal fees, which AT&T claims NCR (and, in turn, AT&T) had overpaid to Cravath for its work on the Fox and Kzoo River litigations on the Past Invoices (together, the "Past Disputed Costs").

58.    On July 31, 2025, NCR provided an informal response to the July Demand by email, noting that a formal response would be forthcoming. In that email, NCR addressed both of the Past Disputed Costs.

59.    With respect to the Fox River tax benefit, NCR reiterated what it had previously told AT&T, which is that legacy NCR (*i.e.*, before its 2023 restructuring) "received very little if any actual economic benefit reflected in [its] tax obligations from the Fox River remediation." NCR nonetheless stated its confidence that the Parties could work through the issue, as they had for the Kzoo River tax benefit just two weeks prior.

60.    With respect to Cravath legal fees, NCR reminded AT&T that the Cravath fees it objected to were incurred as part of the successful legal campaign to reduce NCR's (and by extension, AT&T's) Kzoo River liability.  In particular, NCR noted that, prior to engaging Cravath, NCR faced the threat of bearing remediation costs for the *entire* Kzoo River on its own—which is projected to exceed $1.8 billion—which was not a risk that NCR could take. Here, too, NCR expressed its belief that the Parties could work through the issue.

61.    This time, however, AT&T broke from the Parties' history of good faith negotiations.  In the following months, AT&T began engaging in self-help by withholding payments that became due.

62.    On August 25, 2025, consistent with its past practice, NCR issued Invoice No. Kzoo-11 to AT&T for $3,741,392.99 for remediation work on the Kzoo River.  The sole line item in that invoice was for "Response Costs and Natural Resource Damages" under the Kzoo River Consent Decree, and NCR contemporaneously provided to AT&T backup documentation supporting the invoiced amount.  AT&T did not dispute that this invoice was validly issued, and did not dispute that the invoice fairly reflected its share of Kzoo remediation costs for the second quarter of 2025.  This time, however, AT&T did not remit payment.

63.    On November 4, 2025, NCR sent AT&T a letter formally rejecting AT&T's July Demand and responding to its arguments.  The following day, on November 5, 2025, NCR issued Invoice No. Kzoo-12 for $4,337,949.82, for remediation work on the Kzoo River pursuant to the Kzoo River Consent Decree.  NCR provided supporting documentation for this invoice as well. AT&T raised no concerns with the accuracy of the invoice or supporting documentation.  But again AT&T declined payment.

64.     Instead, by email dated December 5, 2025 (the due date for payment of Invoice No. Kzoo-12), AT&T affirmed that it was "maintaining its position" in its July Demand, and stated that it would be indefinitely "pausing" all invoice payments while it awaits what, in its unilateral determination, constitutes a "good faith counter from NCR."

65.     By email dated December 5, 2025, NCR responded that AT&T had no basis under the SDA to withhold payments, and expressed its regret that AT&T "has elected to take this path…successfully add[ing] more disputes to an already complicated matter."

66.     By email dated December 8, 2025, counsel for AT&T took the position that it "has no payment obligation" on any Kzoo River invoices because it has "yet to receive reasonable supporting information in the Kalamazoo matter for at least $66 million of Cravath invoices"—*i.e.*, the Cravath legal fees reflected on Invoice No. Kzoo-01.  This was the first time that AT&T had raised this issue since March 2025, when NCR provided the underlying invoices.  As NCR explained at the time of transmittal, and has repeated many times since, that documentation constitutes NCR's "complete record" for these legal fees (which date back to 2011).

67.     During these few weeks, NCR sent AT&T multiple pleas to remit payment on the outstanding Kzoo River invoices so that the Parties could focus on resolving the Past Disputed Costs amicably, as they had done for years.  NCR also explained that it is not in a financial position to absorb the delay in payment and that AT&T's breach was causing NCR "actual harm."  AT&T maintained its position.

68.     On December 15, 2025, NCR wrote again to AT&T, urging it once more to pay its outstanding obligations and to "provide assurances that future invoices will be paid when due."  NCR highlighted that AT&T's objection to Cravath's legal fees constituted "reflects differences of opinion on the 'quality and manner' of contribution defenses" and thus "cannot be the subject

of the dispute by the express terms of the SDA."  NCR also committed that, "[w]hen this payment issue is resolved, the parties can commence working to resolution of AT&T's concerns—issues that [NCR] has always expressed the belief that an amicable resolution could be achieved, just as the parties did with respect to the Kalamazoo tax benefit."

69.    On December 19, 2025, AT&T's counsel responded by letter.  Far from providing the requested assurances of payment, AT&T contended that it has *no* payment obligation on *any* Kzoo River invoices because, again based on AT&T's unilateral determination, NCR had not provided "reasonable supporting information" for the Cravath legal fees reflected on Invoice No. Kzoo-01 (that AT&T had long paid), and therefore NCR had not established to AT&T's satisfaction that NCR had met the $100 million threshold for Kzoo River matters.  AT&T further disputed that its "proposal to pause payment of Kalamazoo invoices" constituted a repudiation of its indemnification obligations under the SDA.

70.    On January 7, 2026, NCR sent AT&T an Escalation Notice (as defined in the SDA) regarding AT&T's ongoing breach, requesting a meeting to address the Kzoo Remediation Invoices.[1]

71.    On January 20, 2026, AT&T responded with its own Escalation Notice with respect to the Past Invoices, stating that its Escalation Notice concerned the claims "outlined in the July 23, 2025 PDF letter titled 'AT&T Proposal to NCR – Fox Tax Benefit + Cravath (Fox + Kzoo),' pertaining to (i) NCR's calculation and application of the tax benefit for the Fox River matter as an Exclusive Contingent Liability under the SDA and (ii) AT&T's objections to the billing practices of the Cravath firm for the Fox River and Kalamazoo River matters as Exclusive

---

[1] *See* SDA § 9.2 (defining an Escalation Notice as a notice "demanding an in person meeting involving representatives of the parties at a senior level of management of the parties (or if the parties agree, of the appropriate strategic business unit or division within such entity").

Contingent Liabilities under the SDA." AT&T again asserted—despite the detailed cost information provided by NCR to date—that NCR had "failed to provide reasonable documentation for Cravath's invoices, as required by SDA Section 6.5(a)." Notably, none of the issues raised in AT&T's notice concerns the costs reflected in the outstanding Kzoo Remediation Invoices for which AT&T has refused payment.

72.    AT&T's Escalation Notice also raised an issue with the "amounts NCR has charged for in-house legal fees for both the Fox River and Kalamazoo River matters." This issue was not raised in the July Demand as a purported basis for withholding payment and, to NCR's knowledge, AT&T's objections to its in-house legal fees were resolved years ago.

73.    Together, Invoice Nos. Kzoo-11 and Kzoo-12, totaling $8,079,342.81, remain outstanding and past due. That amount does not include the interest owed pursuant to the SDA. On January 16, 2026, NCR issued Invoice No. Kzoo-13 for $8,210,959.07. Payment on that invoice is due on February 15, 2026. These invoices, together with any future Kzoo River invoices that will be issued, are referred to as the "Kzoo Remediation Invoices."

74.    Pursuant to the SDA, the Parties met and conferred on January 26, 2026. At the meeting, AT&T doubled down on its position, making clear that no payments would be forthcoming, notwithstanding AT&T's clear contractual obligations and the irreparable harm that AT&T's actions are causing to NCR. NCR now seeks this Court's intervention to issue a preliminary injunction in aid of the Parties' arbitration.

## VI.    AT&T Materially Breached the SDA.

75.    AT&T's refusal to pay outstanding and future Kzoo Remediation Invoices is a breach of its obligations under the SDA, for which NCR is entitled to specific performance.

76.    *First,* the SDA is a valid and enforceable contract. For nearly three decades, the Parties have consistently acknowledged and abided by its terms. (*See supra* ¶¶ 2-3, 48-55.)

77.    *Second*, NCR has performed its obligations under the SDA with respect to the Kzoo Remediation Invoices.

78.    NCR has met the $100 million threshold for the Kzoo River liability.  In April 2023, NCR issued Invoice No. Kzoo-01, reflecting nearly $167.8 million in costs incurred by NCR.  Contemporaneously with this invoice, NCR provided spreadsheet documentation in support of its line item calculations, and made clear that underlying invoices were available electronically for AT&T's inspection.  Approximately $66.9 million of those costs were for Cravath legal fees related to the Kzoo River litigation.  NCR has provided to AT&T the full set of underlying Cravath invoices for these fees.

79.    Invoice Nos. Kzoo-2-10 reflected approximately $65.9 in additional costs incurred by NCR.  Of that amount, $54,690.49 was for Cravath legal fees.  In sum, prior to issuing Invoice No. Kzoo-11 (*i.e.*, the first invoice for which AT&T refused payment), NCR had issued ten invoices with reasonable supporting information reflecting that NCR had incurred over $165 million in costs for Kzoo River matters, *excluding* all Cravath legal fees.

80.    In total, including the Kzoo Remediation Invoices, AT&T has incurred and documented for AT&T over $223 million in non-Cravath Kzoo River remediation costs to date.

81.    On August 25, 2025 and November 5, 2025, NCR issued valid invoices for 37% of NCR's costs related to the Kzoo River liability.  (*See supra* ¶¶ 62-63.)  With each invoice, NCR provided supporting documentation.  (*See id*.)  AT&T has not objected to the documentation provided for these invoices, and it has not disputed that these invoices accurately reflect 37% of NCR's Kzoo River remediation costs for the applicable time period.  (*See id*.)

82.    *Third*, AT&T's refusal to make payments on the current Kzoo Remediation Invoices, and its indefinite "pausing" of future payments is a material and unexcused breach of its obligations under Sections 6.3 and 9.9 of the SDA.

83.    Pursuant to Section 6.3 of the SDA, AT&T "shall" reimburse NCR for 37% of Exclusive NCR Contingent Liabilities (in excess of the previously met $100 million threshold). AT&T has never disputed that Kzoo River remediation costs are subject to this allocation; indeed AT&T has, for years, paid its 37% share of these costs.  (*See supra* ¶¶ 2, 21, 48-55.)

84.    AT&T breached its obligation under Section 6.3 by failing to remit payment on Invoice Nos. Kzoo-11 and Kzoo-12, which were due on September 24, 2025 and December 5, 2025, respectively.

85.    AT&T further anticipatorily breached its obligations under Section 6.3 with respect to any future payments owed under the Kzoo Remediation Invoices, including Invoice No. Kzoo-13.  On December 5, 2025, after having failed to remit payment on two invoices, AT&T stated unequivocally that it is "pausing" all future payments until AT&T, in its sole discretion, determines that NCR has made a "good faith counter" to its demand.

86.    AT&T's refusal to make payments on Kzoo Remediation Invoices is also a breach of Section 9.9 of the SDA.  Section 9.9 provides that, in the event of a dispute under the SDA, the Parties must continue to "honor all *other* commitments under this Agreement . . . during the course of dispute resolution pursuant to the provisions of this Article IX [Arbitration; Dispute Resolution] with respect to all matters not subject to such dispute, controversy or claim." (SDA § 9.9 (emphasis added).)

87.    The Kzoo Remediation Invoices are not subject to the Parties' ongoing negotiations with respect to the Past Disputed Costs.  The Kzoo Remediation Invoices do not

contain *any* Cravath legal fees, and are net of the Parties' agreed-upon tax benefit as to the Kzoo River costs. Similarly, the Kzoo Remediation Invoices pertain only to the Kzoo River, so any claimed Fox River tax benefit has no bearing here.

88.    Further, even with respect to the disputed Cravath legal fees (which, again, have nothing to do with the Kzoo Remediation Invoices at issue here), AT&T has no basis to withhold payment. The SDA clearly provides: "It shall not be a defense to any obligation by any party to pay any amount in respect to any Excess Portion . . . *that such party does not approve of the quality or manner of the defense thereof.*" (*Id.* § 6.3(e) (emphasis added).) In other words, the SDA prohibits AT&T from second-guessing the legal fees that NCR incurred in defending itself (and AT&T, as its indemnitor) from billions of dollars in liability.

89.    Finally, NCR has already suffered damages as a direct result of AT&T's breach. The outstanding Kzoo Remediation Invoices total just over $8 million, with interest continuing to accrue each day. That is for only six months of remediation work. Those damages will continue to grow rapidly as NCR continues to remediate the Kzoo River, as it must do under the Kzoo River Consent Decree.

90.    NCR is entitled to specific performance for AT&T's material breach, pursuant to Section 12.13 of the SDA (*see supra* ¶ 27), and in light of the ongoing and irreparable harm that AT&T's refusal to pay is causing to NCR (*see infra* §§ VII-VIII).

**VII.    AT&T's Breach Threatens NCR's Financial Health and Business Operations.**

91.    In addition to constituting a clear breach of contract, AT&T's nonpayment is likely to imminently inflict irreparable harm upon NCR.

92.    AT&T has conceded that a breach of the SDA will cause NCR irreparable harm and has expressly waived any argument to the contrary. (*See* SDA § 12.13; *supra* ¶¶ 5, 27.)

93.     But even setting aside that waiver, NCR is likely to suffer actual irreparable harm imminently because AT&T's breach is:  (i) risking a downgrade to NCR's credit rating and its ability to access capital markets to support its ongoing business operations; and (ii) endangering NCR's continued compliance with the Kzoo River Consent Decree.  Absent injunctive relief, NCR will experience such harm well before it has the chance to exercise its contractual right to arbitrate the merits of AT&T's breach.

94.     Absent this Court's intervention, NCR is likely to suffer irreparable harm because it cannot shoulder AT&T's share of NCR's ongoing obligations under the Kzoo River Consent Decree without risk of impairing its ongoing business operations and financial health.

95.     NCR is at a critical inflection point as it transitions towards providing platform-led software and services, an industry that is fast-evolving and highly competitive.  This transition has been, and continues to be, capital-intensive.  Since 2023, NCR has spent hundreds of millions of dollars in transformation and restructuring costs alone.  (*See supra* ¶ 43.)  It continues to incur annual research and development costs in excess of $100 million to keep pace with technological advancements and remain competitive with its peers.  (*See supra* ¶ 44.)

96.     As described in NCR's Q3 2025 Quarterly Report, "adjusted free cash flow-unrestricted indicates the amount of cash available after capital expenditures for, among other things, investments in the Company's existing businesses, strategic acquisitions, and repayment of debt obligations."  For 2024, NCR reported adjusted free cash flow of *negative* $78 million.  As of the end of Q3 2025 (*i.e.*, the last quarter for which NCR has reported on its financials), its adjusted free cash flow for 2025 was negative $27 million.  AT&T's continued breach would materially risk an increase to NCR's cash flow shortfall.

97.    NCR evaluates on a daily basis whether it has sufficient cash on hand to satisfy its current operating costs consistent with this strategy, or whether it will need to draw on its revolving credit facility (the "Revolver"), which is intended to provide a safety net for managing temporary cash flow gaps and unexpected expenses related to NCR's ongoing business operations.  As NCR acknowledged in its Annual Report for 2024, as a result of its strategic transformation, NCR is "a smaller company with a less diversified product portfolio and a narrower business focus.  As a result, we may be more vulnerable to changing market conditions and the other risks impacting our operations, which could materially and adversely affect our business, financial condition and results of operations."  In other words, unexpected costs that NCR may not have considered material a few years ago now threaten the overall financial health of the company.

98.    The risk that NCR will need to draw down on its Revolver to address legacy liabilities is not theoretical; it is the reality.  As of September 30, 2025, NCR had no amount outstanding on its Revolver, as recorded in its Q3 2025 Quarterly Report.  Subsequent to AT&T's suspension of its payment obligations, NCR has needed to draw on its Revolver, including to cover the over $8 million attributable to AT&T's breach.  If AT&T continues its ongoing breach, NCR risks needing to draw down that Revolver in increasing amounts, taking on increased debt at high interest rates, and leaving less of the Revolver available for ongoing business operations and related contingencies.

99.    As explained in NCR's most recent quarterly report, loans drawn pursuant to the Revolver bear interest based on the "SOFR [Secured Overnight Financing Rate] . . . or, at the Company's option, in the case of amounts denominated in Dollars, at a base reference rate equal to the highest of (a) the federal funds rate plus 0.50%, (b) the rate of interest last quoted by the

Administrative Agent as its "prime rate" and (c) the one-month SOFR rate plus 1.00% (the "Base Rate"), plus, as applicable, a margin ranging from 2.25% to 3.25% per annum for SOFR-based Revolving Loans and ranging from 1.25% to 2.25% per annum for Base Rate-based Revolving Loans, in each case, depending on the Company's consolidated leverage ratio."

100.    Drawing down on the Revolver to address legacy liabilities—for businesses that NCR no longer operates and that AT&T is contractually obligated to indemnify—not only reduces the availability of the Revolver capacity for operational needs, but also risks negatively impacting NCR's ability to access capital markets at this critical inflection point.

101.    NCR has acknowledged the risks of assuming further debt extensively in its recent public filings:

- "Our level of indebtedness could limit our financial and operating activities and adversely affect our ability to incur additional debt to fund future needs."

- "The senior secured credit agreement and the indentures governing our senior unsecured notes also contain certain affirmative covenants, and the senior secured credit agreement requires us to comply with a leverage ratio that measures our debt relative to our Consolidated EBITDA (as defined in the senior secured credit agreement).  These covenants and restrictions *could affect our ability to operate our business and may limit our ability to react to market conditions or take advantage of potential business opportunities as they arise*."

- "If we cannot make scheduled payments on our debt, we will be in default and the outstanding principal and interest on our debt could be declared to be due and payable, in which case we could be forced into bankruptcy or liquidation or required to substantially restructure or alter our business operations or debt obligations."

102.    In June 2025, the credit rating agency Fitch assigned NCR a credit rating score of "BB," with the *key assumption* that NCR would be able to decrease its debt-to-EBITDA ratio from 3.8x to closer to 3.0x by year-end.

103.    A "BB" credit rating is already a "below investment grade" rating, which exposes NCR to high interest rates and signals to investors an elevated risk of default.  Increased utilization of its Revolver capacity by NCR to meet AT&T's share of the Kzoo River remediation costs increases NCR's debt position, and further risks a credit rating downgrade.

104.    This, in turn, also risks harming NCR's attractiveness to investors.  As NCR warned in its 2024 Annual Report, "[a]ny future lowering of our ratings would make it more difficult or more expensive for us to obtain additional debt financing or capital from other financing arrangements."

105.    More than half of NCR's $1.1 billion in outstanding debt obligations, *plus* any amounts NCR draws from its Revolver (plus interest), come due in 2028.  NCR will need to begin efforts to refinance this debt well before year-end.  By that time, NCR's leverage ratio will have increased, and the harm will already have been inflicted, meaning that NCR risks being unable to refinance or restructure its debt on favorable terms (if at all).  As NCR disclosed in its 2024 Annual Report, "[i]f we are unable to continue to access or renew financing sources and obtain capital, our ability to maintain and grow our business may be impaired."

106.    NCR's revolving credit facility has a covenant that requires NCR's debt-to-EBITDA ratio to remain below a specific threshold, or else its debt becomes callable, as disclosed in its 2024 Annual Report:  "The senior secured revolving credit facility also contains a financial covenant that does not permit the Company to allow its consolidated leverage ratio to exceed . . . 4.25 to 1.00 . . . ."  NCR has recognized the stark consequences of failing to service its debt, disclosing in its 2024 Annual Report that "[i]f we cannot make scheduled payments on our debt, we will be in default and the outstanding principal and interest on our debt could be

declared to be due and payable, in which case we could be forced into bankruptcy or liquidation or required to substantially restructure or alter our business operations or debt obligations."

## VIII.   AT&T's Breach Jeopardizes NCR's Ability to Comply with the Kzoo River Consent Decree.

107.    AT&T's breach also risks NCR's ability to comply with its obligations under the Kzoo River Consent Decree.

108.    NCR cannot unilaterally "pause" remediation work to avoid these harms.  If NCR stopped or slowed work due to funding issues caused by AT&T, it risks government sanctions. Given that the governments' covenants to refrain from suing NCR or take administrative action against it "are conditioned upon the satisfactory performance by [NCR] of its obligations under [the Consent Decree]," falling behind on obligations could have significant consequences for NCR.  (*See supra* ¶ 41.)

109.    Even setting aside the possibility of sanctions, NCR's prospective inability to satisfy its obligations under the Kzoo River Consent Decree threatens to erode its goodwill with its regulators.  NCR has spent decades working to build and strengthen its relationships with its regulators, including the EPA and the relevant state agencies, in connection with the remediation efforts along the Kzoo and Fox Rivers.  These regulators wield vast discretion over what NCR must do to comply with its remediation obligations and on what timeline.  (*See supra* ¶ 39.)  And they decide whether NCR has satisfactorily performed its obligations.  By jeopardizing NCR's compliance, AT&T's ongoing breach risks eroding the goodwill that NCR has worked for decades to establish.

110.    These harms likely will materialize before NCR has the opportunity to arbitrate this dispute.  Under the SDA's arbitration procedure, NCR may not receive a final arbitral decision for over six months, and it is suffering now as a consequence of AT&T's breach.

(SDA § 9.4.)  Without a preliminary injunction, NCR may be forced to divert additional sums away from its business operations as soon as next month, when Invoice No. Kzoo-13 comes due. (*See supra* ¶ 73.)  The near-term threat to NCR's credit rating and ability to access capital markets would also likely come to pass well before this dispute can be resolved via arbitration.

## CLAIMS FOR RELIEF

### COUNT I

### (Breach of Contract)

111.    NCR restates, realleges and incorporates by references the allegations set forth in the rest of this Complaint, ¶¶ 1-110, as if fully set forth herein.  Count I is asserted solely for purposes of providing a basis for the injunctive relief requested herein.  The claim set forth in Count I is subject to arbitration and will be adjudicated accordingly in arbitration initiated by NCR.

112.    NCR and AT&T entered into the SDA, which establishes the Parties' respective liabilities following that Transaction.  The SDA is a valid, binding, just and reasonable contract reflecting a mutual exchange of consideration between the Parties.

113.    Among other contractual provisions apportioning liability and indemnities, Sections 6.1 and 6.3 of the SDA govern the Parties' shared liabilities.  Section 9.9 of the SDA ensures that "the parties will continue to provide service and honor all other commitments under this Agreement . . . during the course of dispute resolution pursuant to the provisions of this Article IX with respect to all matters not subject to such dispute, controversy or claim."

114.    NCR performed all conditions, covenants and promises required to be performed by NCR in accordance with the terms of the SDA.

115.    By refusing to pay NCR's Kzoo Remediation Invoices, AT&T breached Sections 6.3 and 9.9 of the SDA.

116.    As an active underwriter and manager of Kzoo River environmental remediation, and as a party to the Kzoo River Consent Decree mandating such efforts, NCR is being harmed by AT&T's breach of the SDA.  NCR has been harmed in an amount of  $8,079,342.81 for the outstanding Invoices, Nos. Kzoo-11 and Kzoo-12, plus interest.  Those damages will continue to grow rapidly as NCR continues to remediate the Kzoo River, as it must do under the Kzoo River Consent Decree.

117.    NCR is suffering and will continue to suffer irreparable injury, and such injury will not abate until injunctive relief is ordered compelling AT&T to honor its contractual obligations under the SDA.

118.    NCR and AT&T are each able to continue performing their respective obligations under the SDA.

119.    NCR seeks specific performance to compel AT&T to honor its obligations under the SDA.  Monetary damages are inadequate to address AT&T's breach and remedy the irreparable harm inflicted upon NCR.  In Section 12.13 of the SDA, both Parties agreed that NCR "shall have the right to specific performance and injunctive or other equitable relief of its rights" in the event of "any actual or threatened breach" by AT&T of "any of the terms, conditions, or provisions" of the SDA; and AT&T expressly waived any defense that a remedy at law would be adequate.

## COUNT II

### (Preliminary Injunction in Aid of Arbitration)

120.    NCR restates, realleges, and incorporates by references the allegations set forth in the rest of this Complaint, ¶¶1-110 as if fully set forth herein.

121.    As set forth above (*supra*, Count I, ¶¶ 111-119), NCR is likely to prevail on the merits of its claim against AT&T for breach of Sections 6.3 and 9.9 of the SDA and is thus

entitled to specific performance.  At minimum, NCR has demonstrated substantial questions as to the merits, and the balance of hardships tips decidedly in NCR's favor.

122.    NCR is suffering irreparable harm and will continue to if AT&T's ongoing breach of the SDA persists (*see supra*, Count I, ¶¶ 111-119) during the pendency of arbitration. Article IX of the SDA establishes the Parties' right to arbitration, and NCR's loss of its contractual right to arbitrate its disputes with AT&T—because of AT&T's existing breach that could render belated arbitration a nullity—constitutes irreparable harm.

123.    In addition, absent this Court's intervention, NCR is likely to suffer irreparable harm because:  (i) NCR cannot shoulder AT&T's share of its ongoing remedial obligations under the Kzoo River Consent Decree without risk of impairing its ongoing business operations and financial health; (ii) AT&T's nonpayment endangers NCR's ability to fund its continued remediation efforts under the Kzoo River Consent Decree, thereby exposing NCR to the risk of regulatory sanctions and threatening to erode NCR's goodwill with its regulators.

124.    The foregoing injury inflicted upon NCR is not quantifiable and is not compensable by monetary damages.  Indeed, the Parties expressly agreed in the SDA "that the remedies at law for any breach or threatened breach, including monetary damages, are inadequate compensation for *any loss* and that any defense in any action for specific performance that a remedy at law would be adequate is waived."  (SDA § 12.13 (emphasis added).)

125.    The balance of hardships tips decidedly in NCR's favor.  Absent injunctive relief, NCR will be deprived of reimbursement funds for properly issued invoices, a financial shortfall that will cause (and is causing) the harms described herein.  By contrast, AT&T is not subjected to any hardships by a preliminary injunction ordering it to honor its contractual obligations under the SDA.

126.    The public interest weighs in NCR's favor.  The public interest is served by NCR's continued ability to support critical environmental work on the Kzoo River for the benefit of the public.  Moreover, the public has an interest in seeing that parties adhere to their contractual obligations, which is all NCR seeks to enforce through this action.  The public interest is additionally served where a preliminary injunction ensures that a contractually-specified arbitration process is not made a hollow formality; AT&T's breach continues to upset the status quo before an arbitrator is able to render judgment.  The issuance of a preliminary injunction thus not only limits NCR's irreparable harm but also supports the well-established federal public policy in favor of arbitration.  Therefore, NCR is entitled to a preliminary injunction in aid of arbitration from this Court to order AT&T to perform its contractual obligations under Sections 6.3 and 9.9 of the SDA until an arbitrator awards relief.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons set forth above, Plaintiff NCR respectfully requests that this Court enter judgment in its favor as follows:

a. preliminary injunctive relief requiring AT&T to perform its obligations under the SDA by timely paying all due invoices (including any interest that has accrued on past, or may accrue on future, late payments pursuant to SDA § 6.3(c)) through the pendency of the dispute resolution process;

b. granting NCR such other and further relief as the Court deems just and proper.

DATED:  January 30, 2026

Respectfully submitted,

By:  _/s/ Yonatan Even_

**CRAVATH, SWAINE & MOORE LLP**
Yonatan Even
yeven@cravath.com
Vanessa A. Lavely
vlavely@cravath.com
Helam Gebremariam
hgebremariam@cravath.com
Katherine A. DuBois
kdubois@cravath.com

Two Manhattan West
375 Ninth Avenue
New York, New York 10001
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

_Attorneys for Plaintiff_
_NCR VOYIX Corporation_

**VERIFICATION OF COMPLAINT**

I, Christopher Murphy, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

I am Corporate Vice President and Deputy General Counsel, Litigation at NCR Voyix ("NCR"). As such, I have full authority to verify the foregoing Verified Complaint on behalf of NCR.

I have read the foregoing Verified Complaint and I am informed and believe that the factual allegations contained in Paragraphs 1-5, 8, 9, 10-41, 48-90, 92, and 107-126 are true and accurate to the best of my own knowledge, except as to matters alleged upon information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 30, 2026.

Christopher Murphy

**VERIFICATION OF COMPLAINT**

I, Richard McKenzie, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

I am Vice President, Tax and Treasurer at NCR Voyix ("NCR").  As such, I have full authority to verify the foregoing Verified Complaint on behalf of NCR.

I have read the foregoing Verified Complaint and I am informed and believe that the factual allegations contained in Paragraphs 6, 7, 42-47, 91, and 93-106 are true and accurate to the best of my own knowledge, except as to matters alleged upon information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 30, 2026.

Richard McKenzie