**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NCR VOYIX CORPORATION<br><br>       *Plaintiff,*<br><br>v.<br><br>AT&T ENTERPRISES, LLC,<br>f/k/a AT&T CORP.<br><br><br>       *Defendant.* | Case No. 26-cv-00848 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF NCR VOYIX**
**CORPORATION'S MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT..................................................................................................1

STATEMENT OF FACTS ......................................................................................................5

      A.      AT&T Acquires and then Spins Off NCR Pursuant to the SDA..............................5

      B.      NCR Enters into Consent Decrees Related to Its Legacy Business.......................6

      C.      For Over a Decade, AT&T Complies With Its Payment Obligations, Despite Disputes Regarding Past Invoices. .............................................................10

      D.      AT&T Stops Paying Kzoo Remediation Invoices and Repudiates Its Obligations Under the SDA. .................................................................................10

LEGAL STANDARD ............................................................................................................13

ARGUMENT .........................................................................................................................16

I.      NCR is Likely to Succeed on the Merits or, At Minimum, Has Established Sufficiently Serious Merits Questions. ..................................................................16

      A.      NCR Is Likely to Succeed on the Merits of Its Breach of Contract Claim............16

      B.      At Minimum, NCR Has Established a Serious Question on the Merits Plus a Balance of Hardships in Its Favor. .........................................................................19

II.      NCR Is Likely to Suffer Irreparable Harm Absent Injunctive Relief. ...............................20

      A.      AT&T Has Already Conceded that a Breach of Its Obligations Under the SDA Cannot Be Adequately Compensated by Money Damages...........................21

      B.      AT&T's Breach Threatens Irreparable Harm to NCR's Financial Health, Ongoing Business Operations and Regulatory Compliance................................22

      C.      NCR's Loss of Its Contractual Right to Meaningfully Arbitrate This Dispute Is Also Irreparable Harm. ...........................................................................25

III.      A Preliminary Injunction Is in the Public Interest. ............................................................26

CONCLUSION.......................................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*301 East 60th St. LLC v. Competitive Sols. LLC*,
190 N.Y.S. 3d. 79 (N.Y. App. Div. 2023) .....................................................................19

*Am. Exp. Fin. Advisors Inc. v. Thorley*,
147 F.3d 229 (2d Cir. 1998)........................................................................................13

*Bancroft Life & CasICC, Ltd. v. Intercontinental Mgmt. Ltd*,
456 Fed. App'x 184 (3d Cir. 2012)..............................................................................25

*Bank of Am., N.A. v. PSW NYC LLC*,
918 N.Y.S. 2d 396 (N.Y. Sup. Ct. 2010) .....................................................................21

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
784 F.3d 887 (2d Cir. 2015)..............................................................................14, 15, 21

*Bionpharma Inc. v. CoreRx, Inc.*,
582 F. Supp. 3d 167 (S.D.N.Y. 2022).................................................................14, 16, 27

*Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
910 F.2d 1049 (2d Cir. 1990)....................................................................................13, 14

*Citigroup Glob. Mkts, Inc. v. VCG Special Opportunities Grp.*,
598 F.3d 30 (2d Cir. 2010).......................................................................................19, 20

*Colonial Sur. Co. v. Eastland Const., Inc.*,
2009 WL 2440307 (N.Y. Sup. Ct. 2009)..................................................................15, 22

*Credit Suisse Sec. (USA) LLC v. Ebling*,
2006 WL 3457693 (S.D.N.Y. Nov. 27, 2006) .............................................................26

*Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*,
96 F.4th 351 (2d Cir. 2024) ........................................................................................14

*Fifty States Mgmt. Corp. v. Pioneer Auto Parks, Inc.*,
46 N.Y. 2d 573 (N.Y. 1979) ........................................................................................17

*Gibson v. U.S. Immigr. & Naturalization Serv.*,
541 F. Supp. 131 (S.D.N.Y. 1982)................................................................................16

*In re WorldCom, Inc. Sec. Litig.*,
354 F. Supp. 2d 455 (S.D.N.Y. 2005).........................................................................15

*Intertek Testing Servs., N.A., Inc. v. Pennisi*,
443 F. Supp. 3d 303 (E.D.N.Y. 2020) .....................................................................20, 21

*James River Grp. Holdings, Ltd. v. Fleming Intermediate Holdings LLC*,
    84 Misc.3d 931 (N.Y. Sup. Ct. 2024) ...................................................................15, 22

*Metro. Transp. Auth. v. Duffy*,
    784 F. Supp. 3d 624 (S.D.N.Y. 2025)..........................................................................26

*Novotech (Austl.) PTY Ltd. v. SureClinical Inc.*,
    2022 WL 17419168 (E.D. Cal. Dec. 2, 2022) ..............................................................25

*Painewebber, Inc. v. Nwogugu*,
    1998 WL 545327 (S.D.N.Y. Aug. 21, 1998)................................................................24

*REA Express, Inc. v. Interway Corp.*,
    538 F.2d 953 (2d Cir. 1976)..........................................................................................17

*Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*,
    754 F. Supp. 2d 616 (S.D.N.Y. 2010) ..........................................................................27

*Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*,
    749 F.2d 124 (2d Cir. 1984) (per curiam).....................................................................14

*Thales Avionics, Inc. v. L3 Techs., Inc.*,
    719 F. Supp. 3d 337 (S.D.N.Y. 2024)...............................................................20, 26, 27

*Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*,
    73 F. Supp. 3d 209 (S.D.N.Y. 2014).............................................................................20

*Wells Fargo v. Bank of Am., N.A.*,
    2013 WL 372149 (S.D.N.Y. Jan. 31, 2013) .................................................................19

**PRELIMINARY STATEMENT**

This Motion for a Preliminary Injunction in aid of arbitration seeks to prevent ongoing

and irreparable harm that AT&T Enterprises, LLC, f/k/a AT&T Corp. ("AT&T") is intentionally

inflicting on NCR Voyix ("NCR" and together with AT&T, the "Parties") by refusing to honor a

contractual commitment that AT&T complied with for years, until it suddenly stopped.  AT&T is

required to indemnify NCR for liabilities that accrued prior to AT&T's decision to spin off NCR

as an independent company.  At the time of their corporate separation in 1996, the Parties

explicitly agreed on a formula for sharing those liabilities, as set forth in the Parties' Separation

and Distribution Agreement ("SDA").[1]  (SDA § 6.3(b)(2).)  AT&T also explicitly agreed that any

breach of its obligations under the SDA cannot be adequately compensated by monetary

damages, and irrevocably waived any argument to the contrary, making clear that injunctive

relief is appropriate here.  (*Id.* § 12.13.)

AT&T performed under this contract for nearly a decade, indemnifying NCR for costs

that NCR incurred in meeting its environmental remediation obligations pursuant to two court-

approved government consent decrees, one relating to the Fox River in Wisconsin and the other

relating to the Kalamazoo River in Michigan ("Kzoo River").  But AT&T has now reneged on

the Parties' decades-old agreement and seeks to force NCR—a company with a fraction of its

resources—to shoulder AT&T's share of those costs indefinitely.  Specifically, in

December 2025, after failing to remit payment on two validly issued invoices requiring AT&T to

pay NCR over $8 million, AT&T notified NCR that it is halting all payments on its contractually

obligated indemnity of ongoing Kzoo River remediation work—work that NCR must perform

---

[1] The SDA is attached as Exhibit 1 to NCR's Verified Complaint Seeking Preliminary Injunction in Aid of Arbitration (the "Complaint").

under its consent decree with the United States and the State of Michigan ("Kzoo River Consent Decree").  NCR promptly escalated the dispute, in the hope that AT&T's blatant breach was mere posturing and could be quickly resolved; alas, on January 26, 2026, at an escalation meeting between the Parties' executives, AT&T doubled down on its position, making clear that no payments would be forthcoming, notwithstanding AT&T's clear contractual obligations and the irreparable harm that AT&T's actions are causing to NCR.

AT&T provides no valid reason to refuse payment on these invoices.  AT&T does not dispute that the SDA requires AT&T to indemnify NCR for 37% of costs relating to remediation of the Kzoo River.  Nor does AT&T dispute that the invoices reflect 37% of NCR's Kzoo River remediation costs for the invoiced period.  Rather, AT&T's admitted purpose in withholding these payments is to exert negotiation power over NCR in connection with a separate dispute.  Specifically, AT&T claims it had previously overpaid certain invoices, contesting two issues: (i) the amount of legal fees NCR had incurred in defending litigations related to its Fox River and Kzoo River liabilities, which litigations culminated in the above-mentioned consent decrees; and (ii) a Fox River tax benefit it claims should have been netted out from previously paid Fox River invoices.  Those issues (which NCR strongly contests and will address in a separate forum) exclusively pertain to *past invoices* that AT&T has long since paid.  The recently issued invoices that AT&T refuses to pay—which relate solely to NCR's current Kzoo River remediation expenses—do not contain *any* disputed legal fees, and are net of the Parties' agreed-upon tax benefit as to the Kzoo River costs.

Despite having no basis for its refusal to pay, AT&T has made clear that it will not resume payments of *any* Kzoo River remediation-related invoices until NCR capitulates to its demands regarding past payments of legal fees and the Fox River tax issue.  Such self-help is squarely addressed in and prohibited by the SDA, which states that the Parties "will continue to

2

provide service and honor all other commitments under this Agreement . . . during the course of dispute resolution . . . with respect to all matters not subject to such dispute, controversy or claim." (SDA § 9.9.)

AT&T is well aware of the pressure its holdout places on NCR. As NCR has explained to AT&T in the context of this dispute, NCR's business is at a critical inflection point: it has sizeable debt while undergoing a strategic shift in operational focus, and its financial future depends on the successful execution of this transition. NCR cannot currently afford to divert millions in cash away from ongoing business operations to fund liabilities that stem from legacy businesses and that AT&T is contractually obligated to pay. Yet that is precisely what AT&T is trying to bring to pass.

NCR has initiated the dispute resolution process required by the SDA and will seek specific performance of AT&T's contractual obligations in arbitration. But before NCR has the opportunity to be heard in arbitration, it stands to suffer ever-increasing irreparable harm by virtue of AT&T's intentional breach. That harm may well force NCR to capitulate to AT&T before the issue of breach can be adjudicated by an arbitrator. Indeed, that appears to be AT&T's plan—to use financial pressure to force NCR to capitulate, rather than defend its position through arbitration. Such tactics should not be condoned. NCR thus asks this Court for interim relief in aid of arbitration to preserve the status quo. This relief is appropriate here, for the following reasons:

*First*, NCR is likely to succeed on the merits of its breach of contract claim, or, at minimum, demonstrates a serious question on the merits, and the balance of hardships tips in NCR's favor. AT&T's indefinite withholding of payments is a clear breach of Sections 6.3 and 9.9 of the SDA, which may be remedied only by specific performance. (Section I.)

*Second*, AT&T's breach of its obligation to indemnify NCR is causing NCR irreparable harm. This is the rare occasion where nonpayment of money causes harm that is irreparable. Indeed, the Parties agreed that *any* breach of *any* of AT&T's obligations cannot be adequately compensated by monetary damages, and AT&T has expressly *waived* any argument to the contrary. (SDA § 12.13.) Courts in this Circuit routinely credit the parties' explicit agreement in finding the irreparable harm requirement is met. (Section II.A.) Moreover, the harm here is *in fact* irreparable. As a result of AT&T's nonpayment, NCR has already been forced to deplete capital resources intended for its ongoing business operations in order to perform its obligations under the Kzoo River Consent Decree; and it will continue to have to divert resources or accumulate debt with each unpaid invoice. This increased debt risks a downgrade to NCR's credit rating (which is already below investment grade) during a time when NCR is likely to access the capital markets to refinance its debt in connection with its ongoing restructuring. Any downgrade to NCR's credit rating will make accessing the capital markets more difficult and impede its ability to fund the ongoing remediation work on the Kzoo River. (Section II.B.) In addition, absent this Court's intervention, this damage will be inflicted before NCR has the opportunity to exercise its contractual right to arbitrate the merits of AT&T's breach, which is itself another form of irreparable harm. (Section II.C.)

*Third*, there is a strong public interest in having parties honor their contractual obligations and ensuring that the arbitration of disputes is not a mere "hollow formality." This, too, supports granting the requested preliminary injunction. That is particularly true where, as here, the conduct to be enjoined could impede crucial environmental remediation work that benefits the public. (Section III.)

4

**STATEMENT OF FACTS**

**A.      AT&T Acquires and then Spins Off NCR Pursuant to the SDA.**

In 1991, following a hard-fought takeover battle, AT&T acquired NCR's predecessor company, National Cash Register Corp. ("NCR Corp."), in a deal valued at approximately $7.5 billion.  (Compl. ¶ 18.)  Five years following that merger, AT&T spun-off NCR Corp. to establish NCR.  (*Id.*)  The terms of that transaction were set forth in the SDA, dated February 1, 1996, and Amended and Restated as of March 29, 1996.  (*Id.*)

Among other things, the SDA established a comprehensive scheme for sharing future costs incurred by either Party as a result of unknown liabilities that accrued prior to the spin-off transaction ("Contingent Liabilities").  (*See* SDA § 6.1.)  As relevant to this dispute, the SDA provides that, for Contingent Liabilities that relate primarily to NCR's business ("Exclusive NCR Contingent Liabilities"), NCR "shall be entitled to reimbursement" from AT&T for 37% of costs in excess of $100 million ("Excess Portion").  (*Id.* § 6.3(b)(ii).)  Exclusive NCR Contingent Liabilities subject to reimbursement expressly include "Environmental Liabilities," meaning liabilities "relating to, arising out of or resulting from any Environmental Law or contract or agreement relating to environmental matters, health or safety matters," including "all removal, remediation or cleanup costs, investigatory costs, governmental response costs, . . . costs of compliance with any settlement, . . . and *all costs and expenses* (including allocated costs of in-house counsel and other personnel) . . . in connection therewith."  (*Id.* § 1.41 (emphasis added); *see id.* § 6.1(l).)  Pursuant to the SDA, AT&T's "views or opinions" regarding "the quality or manner" of NCR's defense to such liabilities "shall not be a defense" to AT&T's obligation "to pay any amount in respect of any Excess Portion."  (*Id.* § 6.3(e).)  Any amounts billed to AT&T for such costs that are not paid within 30 days "shall bear interest at the Prime Rate plus 2% per annum."  (*Id.* § 6.5(c).)

The Parties also set forth a framework for resolving any disputes arising out of or relating to the SDA.  The SDA requires arbitration of "all disputes, controversies or claims."  (*Id.* § 9.1.)  As part of the dispute resolution process, however, the SDA permits any party to "seek one or more temporary restraining orders in a court of competent jurisdiction if necessary in order to preserve and protect the status quo."  (*Id.* § 9.7(b).)  The Parties also specifically contracted for the right to compel one another to comply with *any* of their obligations under the SDA— including their obligations to reimburse one another for Contingent Liabilities.  Section 12.13 of the SDA, titled "Specific Performance," provides:

> In the event of *any* actual or threatened default in, or breach of, *any* of the terms, conditions and provisions of this Agreement or any Ancillary Agreement, the party or parties who are or are to be thereby aggrieved *shall have the right to specific performance and injunctive or other equitable relief* of its rights under this Agreement or such Ancillary Agreement, in addition to any remedies at law or in equity, and all such rights and remedies shall be cumulative.  The parties agree that *the remedies at law for any breach or threatened breach, including monetary damages, are inadequate compensation for any loss* and that *any defense in any action for specific performance that a remedy at law would be adequate is waived*.

(*Id.* § 12.13 (emphases added).)  Critically, in the event of a dispute, the SDA requires the Parties to continue to "honor all other commitments under this Agreement."  (*Id.* § 9.9.)  In other words, the Parties expressly agreed that a dispute as to *one* obligation under the SDA does not absolve the fulfillment of any *other* SDA obligations.  And there is no provision of the SDA that allows for self-help withholding of payments in the event of a dispute.

**B.      NCR Enters into Consent Decrees Related to Its Legacy Business.**

Between 2008 and 2020, NCR was involved in series of complex litigations regarding its alleged role in the discharge of polychlorinated biphenyls ("PCBs")—a chemical widely used in

6

manufacturing through the 1970s but now banned in the United States—into the Fox River in Wisconsin and the Kzoo River in Michigan. (Compl. ¶ 30.)

In early 2011, an Eastern District of Wisconsin court ruled on summary judgment that NCR is 100% responsible (and dozens of other companies are 0% responsible) for cleaning up most of the Fox River (everywhere downstream of a facility an NCR predecessor had owned), exposing NCR to billions of dollars in liability. (*Id.* ¶ 31.) NCR retained Cravath, Swaine & Moore LLP ("Cravath") to challenge that finding. With Cravath serving as its lead counsel on all Fox River (and Kzoo River) litigation matters from that point forward, NCR managed to drastically reduce its exposure. (*Id.* ¶ 32.) Following trial regarding the unresolved upstream area, the court ruled that NCR was not liable as an "arranger" for the disposal of hazardous waste. (*Id.*) That trial decision was affirmed on appeal, and the Seventh Circuit vacated the district court's earlier summary judgment ruling that had held NCR 100% responsible for cleanup of all downstream areas. (*Id.*)

Meanwhile, extensive litigation ensued with respect to the Kzoo River, where again multiple parties sought to hold NCR solely responsible for all remediation. (*Id.* ¶ 33.) Cravath represented NCR in two trials and several appeals in that action as well, with the Western District of Michigan ultimately finding that NCR was not the sole responsible party. (*Id.*)

All told, the Fox River and Kzoo River litigation matters involved countless motions and briefs, four trials, various injunction proceedings, multiple rounds of appeals, arbitration proceedings to resolve related indemnification issues, and many issues of first impression. (*Id.* ¶ 34.) Although this lengthy, complex litigation was costly, it ultimately saved NCR (and AT&T) billions of dollars by allocating liability to multiple other parties. (*Id.*)

As a result of the substantially stronger position Cravath helped NCR secure, NCR eventually resolved its liability for the Fox and Kzoo Rivers by entering into Consent Decrees,

with AT&T's full knowledge and consent.  (*Id.* ¶ 35.)  In 2017, NCR entered into the Fox River

Consent Decree with the United States and the State of Wisconsin.  (*Id.* ¶ 36.)  In 2019, NCR

entered into the Kzoo River Consent Decree with the United States and the State of Michigan.

(*Id.*)  These Consent Decrees require NCR, among other things, to perform remediation work to

remove PCBs in certain segments (or "operational units") of the Fox and Kzoo Rivers.

(*Id.* ¶ 37.)  NCR completed its obligations under the Fox River Consent Decree in 2022.  (*Id.*)  Its

obligations under the Kzoo River Consent Decree are ongoing and expected to last years.  (*Id.*)

Pursuant to the Kzoo River Consent Decree, NCR is responsible for the remediation of

three segments of the Kzoo River.  (*Id.* ¶ 38.)  The U.S. Environmental Protection Agency

("EPA"), which oversees NCR's remediation efforts, designated one of NCR's segments as a

"time critical removal action"—meaning the area is affected by "conditions presenting imminent

and substantial endangerment" that require timely and consistent remediation.  (*Id*.)  Thus far, the

EPA has allowed NCR to prioritize this "time critical" river segment ahead of its work on the

remaining operational units, rather than requiring NCR to remediate all three operational units

simultaneously.  (*Id.* ¶ 39.)  But the EPA, in consultation with other federal and state regulators,

maintains discretion over the timing of, and specific requirements for, NCR's completion of its

work under the Kzoo River Consent Decree.  (*Id.*)

NCR's remediation work under the Kzoo River Consent Decree is a significant

undertaking.  It requires NCR to underwrite and manage an expansive project involving

extensive engineering work and construction in order to dredge the river, stabilize the riverbank,

and dispose of waste.  (*Id.* ¶ 40.)  The workforce consists of hundreds of contractors (and sub-

contractors), construction workers, technical specialists, and environmental experts, all of whom

require timely payment for their work to ensure each phase of the iterative cleanup process

occurs on schedule. (*Id.*) In total, the cost to remediate the areas assigned to NCR is projected to be over half a billion dollars without payment from NCR's indemnitors. (*Id.*)

The Kzoo River Consent Decree outlines "Stipulated Penalties" for any unexcused failure by NCR to comply with its obligations. (*Id.* ¶ 41.) In addition to financial penalties, the United States and State of Michigan expressly reserve the right "to seek any other remedies or sanctions available" for a violation. (*Id.*) Although the United States and State of Michigan each covenanted "not to sue or to take administrative action against" NCR under the agreement, "[t]hese covenants are conditioned upon the satisfactory performance by [NCR] of its obligations" under the Kzoo River Consent Decree. (*Id.*) Consequently, either the federal or state government can reopen enforcement proceedings against NCR should it fall behind on remediation, even if such delay is caused through no fault of NCR. (*Id.*)

In 2023, NCR began strategically transforming its business to focus exclusively on the provision of platform-led software and services—a departure from its history as primarily a provider of *hardware*-based digital commerce solutions. (*Id.* ¶ 42.) This transformation comes at a cost, and is not without risk. (*See id.* ¶¶ 43-46.) As NCR disclosed in its Annual Report for 2024, its "business, results of operations and financial conditions" depend on its ability to "successfully develop new solutions that achieve market acceptance and keep pace with technological developments." (*Id.* ¶ 46.) While in the midst of this critical transition, NCR is bearing AT&T's share of the cost of a half-billion-dollar project to remediate its assigned areas of the Kzoo River—work that has nothing to do with NCR's current business and does not earn the company any revenue. (*Id.* ¶ 47.)

9

C.      **For Over a Decade, AT&T Complies With Its Payment Obligations, Despite Disputes Regarding Past Invoices.**

By November 2012, NCR had met the SDA's $100 million threshold for the Fox River site. (*Id.* ¶ 48.) Pursuant to the SDA, NCR then began invoicing AT&T for its 37% share of additional costs incurred by NCR. (*Id.*) Beginning in 2013, AT&T began to voice certain concerns regarding the Fox River invoices. AT&T raised two concerns in particular: (i) AT&T took issue with certain Cravath legal fees incurred by NCR in mounting its defense against liabilities relating to the Fox River, and requested supporting documentation for such fees; and (ii) AT&T claimed that NCR failed to net out on its invoices certain tax benefits associated with its liabilities on the Fox River. (*Id.* ¶ 49.) For over a decade, as these invoices were being issued, NCR engaged in good faith with AT&T to try to resolve its disputes, including by providing detailed backup for the Cravath legal fees on Fox River invoices. (*Id.* ¶ 50.) Despite these disputed costs, AT&T continued to pay what it owed on the Fox River invoices. (*Id.* ¶ 51.) AT&T had paid in full the principal balance on all Fox River invoices by February 2024. (*Id.*)

By April 2023, NCR had met the $100 million threshold for liabilities arising out of the Kzoo River site, and began invoicing AT&T for its 37% share of the costs it incurred above that threshold. (*Id.* ¶ 52.) Between April 2023 and April 2025, NCR issued ten Kzoo River invoices to AT&T (together with the Fox River invoices, the "Past Invoices"). (*Id.*) As it had done on the Fox River invoices, AT&T questioned NCR's calculation of its tax benefit for the Kzoo River matter and requested additional documentation for Cravath legal fees incurred in the Kzoo River litigation. (*Id.* ¶ 53) Consistent with its past practice, NCR continued to work in good faith to resolve AT&T's concerns. (*Id.*) In March 2025, NCR provided AT&T with its full record of supporting documentation for Cravath legal fees, including each underlying invoice as it had been received by NCR. (*Id.* ¶ 54.) And, on June 12, 2025, the Parties entered into an agreement

10

resolving their dispute as to the proper calculation of the Kzoo River tax benefit and agreeing separately address the ongoing dispute as to the Fox River tax benefit. (*Id.* ¶ 55.)

AT&T, for its part, complied with its obligations pursuant to the SDA and paid all ten of the Kzoo River invoices in full. (*Id.* ¶ 52.)

### D.      AT&T Stops Paying Kzoo Remediation Invoices and Repudiates Its Obligations Under the SDA.

Then, on July 23, 2025, AT&T's counsel "proposed" that in order to resolve AT&T's outstanding objections regarding the Past Invoices, NCR should "halt[] future Kalamazoo invoicing to AT&T for SDA cost-sharing" until NCR has incurred an additional $123 million in expenses pursuant to the Kzoo River Consent Decree ("July Demand"). (*Id.* ¶ 56.) AT&T claimed in the July Demand that the $123 million write-off reflected: (i) a proposed write-off by NCR of $38 million of the $46 million in tax benefits AT&T claimed NCR had gained for *Fox River* remediation work; and (ii) a proposed write-off for $85 million in disputed legal fees, which AT&T claims NCR (and, in turn, AT&T) had overpaid to Cravath for its work on the Fox and Kzoo River litigations on the Past Invoices (together, "Past Disputed Costs"). (*Id.* ¶ 57.)

On July 31, 2025, NCR responded to the July Demand expressing its sincere belief that the Parties could work through both issues, as they had done successfully in the past. (*Id.* ¶¶ 58-60.) This time though, AT&T abruptly broke from past practice. In the following months, AT&T began engaging in self-help by withholding payments that became due. (*Id.* ¶ 61.) On August 25, 2025, NCR issued Invoice No. Kzoo-11 to AT&T for $3,741,392.99 for remediation work on the Kzoo River. (*Id.* ¶ 62.) The sole line item in that invoice was for "Response Costs and Natural Resource Damages" under the Kzoo River Consent Decree, and NCR contemporaneously provided to AT&T backup documentation supporting the invoiced amount. (*Id.*) AT&T did not dispute that this invoice was validly issued, and did not dispute that the

11

invoice fairly reflected its share of Kzoo remediation costs for the second quarter of 2025. (*Id.*) This time, however, AT&T did not remit payment. (*Id.*)

On November 4, 2025, NCR sent AT&T a letter formally rejecting AT&T's July Demand and responding to its arguments. (*Id.* ¶ 63.) The following day, on November 5, 2025, NCR issued Invoice No. Kzoo-12 for $4,337,949.82, for remediation work on the Kzoo River pursuant to the Kzoo River Consent Decree. (*Id.*) NCR provided supporting documentation for this invoice as well. (*Id.*) AT&T raised no concerns with the accuracy of the invoice or supporting documentation. (*Id.*) But again AT&T declined payment. (*Id.*) Instead, by email dated December 5, 2025 (the due date for payment of Invoice No. Kzoo-12), AT&T affirmed that it was "maintaining its position" in its July Demand, and stated that it would be indefinitely "pausing" all invoice payments while it awaits what, in its unilateral determination, constitutes a "good faith counter from NCR." (*Id.* ¶ 64.) Together, Invoice Nos. Kzoo-11 and Kzoo-12, totaling $8,079,342.81, remain outstanding and past due. (*Id.* ¶ 73.) That amount does not include the interest owed pursuant to the SDA. (*Id.*) These invoices, together with Invoice No. Kzoo-13—issued on January 16, 2026 for $8,210,959.07 (*id.*)—and any future Kzoo River invoices that will be issued, are referred to as the "Kzoo Remediation Invoices."

Throughout this time period, NCR repeatedly urged AT&T to pay the outstanding Kzoo Remediation Invoices and provide reasonable assurances of future payment. (*Id.* ¶¶ 67-69.) NCR, in turn, assured AT&T that, if such payment was provided, it was confident the Parties could resolve their disputes as they had done with the Kzoo River tax benefit. (*Id.* ¶ 68.) These pleas were unsuccessful. AT&T not only maintained its position as set forth in the July Demand; it further contended—despite having received NCR's entire record of Cravath invoices—that it has *no* payment obligation on *any* Kzoo River invoices because NCR had not provided

12

"reasonable supporting information" for the approximately $67 million in Cravath legal fees on Invoice No. Kzoo-01 (that AT&T had long paid).  (*Id.* ¶ 69.)

On January 7, 2026, NCR sent AT&T an Escalation Notice (as defined in the SDA) regarding AT&T's ongoing breach, requesting a meeting to address the Kzoo Remediation Invoices.  (*Id.* ¶ 70.)  On January 20, 2026, AT&T responded with its own Escalation Notice with respect to the Past Invoices.  (*Id.* ¶ 71.)  Notably, none of the issues raised in AT&T's notice concerns the costs reflected in the outstanding Kzoo Remediation Invoices for which AT&T has refused payment.[2]  (*Id.*)

Pursuant to the SDA, the Parties met and conferred on January 26, 2026.  (*Id.* ¶ 74.) AT&T again maintained its positions and did not provide any assurances that payment was forthcoming.  (*Id.*.)  NCR now seeks this Court's intervention to issue a preliminary injunction in aid of the Parties' arbitration.

## LEGAL STANDARD

This Court has jurisdiction to issue a preliminary injunction pending arbitration.  *See Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1052-53 (2d Cir. 1990).  "[T]he expectation of speedy arbitration does not absolve the district court of its responsibility to decide requests for preliminary injunctions on their merits."  *Am. Exp. Fin. Advisors Inc. v. Thorley*, 147 F.3d 229, 231 (2d Cir. 1998).  Rather, a preliminary injunction in aid of arbitration prevents arbitration from "becom[ing] a 'hollow formality' if parties are able to

---

[2] AT&T also raised an issue with the "amounts NCR has charged for in-house legal fees for both the Fox River and Kalamazoo River matters."  (Compl. ¶ 72.)  This issue was not raised in the July Demand as a purported basis for withholding payment and, to NCR's knowledge, AT&T's objections to its in-house legal fees were resolved years ago.  (*Id.*)

13

alter irreversibly the status quo before the arbitrators are able to render a decision in the dispute."
*Blumenthal*, 910 F.2d at 1053.

The SDA is governed by, construed, and interpreted in accordance with New York law (aside from its laws of arbitration) "as to all matters, including matters of validity, construction, effect, enforceability, performance and remedies." (SDA § 12.2.) Under New York law, the standard for a preliminary injunction in aid of arbitration is largely the same as the standard for preliminary injunctions in other cases, though courts allow a lesser showing for the merits prong in the arbitration context. *See Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125-26 (2d Cir. 1984) (per curiam). Specifically, a movant seeking a "prohibitory" injunction to preserve the status quo must show (i) "a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor"; (ii) a likelihood of "irreparable injury in the absence of an injunction"; (iii) that "the balance of hardships tips in the plaintiff's favor"; and (iv) that the "public interest would not be disserved" by the issuance of an injunction. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015); *see Bionpharma Inc. v. CoreRx, Inc.*, 582 F. Supp. 3d 173-74 (S.D.N.Y. 2022) (explaining the different burdens for "mandatory" versus "prohibitory" injunctions).

An injunction aimed at enforcing contractual rights is properly considered "prohibitory" where the defendant's alleged failure to perform represents "a departure from the presumed contractual status quo, not an extension of it." *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 357 (2d Cir. 2024). This Court has held that an injunction requiring a defendant to resume contractual payments that it had been making before the dispute arose is a "prohibitory injunction" and is not subject to a heightened burden of proof (unlike a mandatory injunction). *See Bionpharma*, 582 F. Supp. 3d at 173-74 (holding movant seeking to

14

enforce a contract sought relief that was "better categorized as prohibitory . . . [because] the injunction here would maintain[] the situation that would prevail if the contract were properly performed" (citations and quotations omitted)); *In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d 455, 463, 471 (S.D.N.Y. 2005) (granting preliminary injunction that required defendant to pay plaintiff's defense costs pursuant to insurance agreement).

Courts will enforce as written an explicit agreement between sophisticated parties stipulating that a breach of contract will cause irreparable harm and/or waiving their defenses to the contrary. *See James River Grp. Holdings, Ltd. v. Fleming Intermediate Holdings LLC*, 224 N.Y.S. 3d. 11-12 & n.22 (N.Y. Sup. Ct. 2024) (citing to contractual provision providing that breach will cause irreparable harm and waiving any defense that there is an adequate remedy of law, and finding that "[c]ourts enforce such provisions when negotiated by sophisticated counsel"); *Colonial Sur. Co. v. Eastland Const., Inc.*, 2009 WL 2440307, at *4-5 (N.Y. Sup. Ct. July 30, 2009), *aff'd as modified,* 77 A.D.3d 581 (N.Y. App. Div. 2010) (defendants' argument that plaintiff failed to demonstrate irreparable harm for purposes of preliminary injunction "must fail" in light of contractual provision stipulating that harm would be irreparable and waiving defenses to specific performance). Such provisions are routinely credited as direct evidence that the "irreparable injury" element is met for purposes of a preliminary injunction. *Benihana*, 784 at 895 (affirming that "under [Second Circuit] precedent such an irreparable harm provision in the parties' agreement . . . is relevant evidence that can help support a finding of irreparable injury" (internal citations and quotations omitted)).

15

**ARGUMENT**

**I.    NCR IS LIKELY TO SUCCEED ON THE MERITS OR, AT MINIMUM, HAS ESTABLISHED SUFFICIENTLY SERIOUS MERITS QUESTIONS.**

**A.    NCR Is Likely to Succeed on the Merits of Its Breach of Contract Claim.**

To demonstrate a likelihood of success on the merits, the court need only find a "strong prima facie case to justify the discretionary issuance of preliminary relief." *Gibson v. U.S. Immigr. & Naturalization Serv.*, 541 F. Supp. 131, 137 (S.D.N.Y. 1982).  NCR's breach of contract claim against AT&T readily meets that standard.

To establish a breach claim under New York law, a plaintiff must demonstrate:  "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Bionpharma*, 582 F. Supp. 3d at 176.  NCR can establish each element.

*First*, it is indisputable that the SDA is a valid and enforceable contract.  For nearly three decades, the Parties have consistently acknowledged and abided by its terms.  (Compl. ¶ 76.)

*Second*, NCR has performed its obligations under the SDA with respect to the Kzoo Remediation Invoices.  AT&T has not raised a single issue with respect to the amounts reflected on, or supporting documentation provided for, the outstanding Kzoo Remediation Invoices.  (*Id.* ¶ 81.)

AT&T attempts to dodge its payment obligations by claiming that NCR failed to provide "reasonable supporting information" for the Cravath legal fees reflected on the first Kzoo River invoice, such that AT&T purportedly cannot confirm whether the $100 million threshold has been met.  This argument is a red herring.  There is no question that NCR exceeded the cost threshold with respect to Kzoo River liabilities.  Even *excluding* Cravath legal fees *in their entirety*—which AT&T has never insisted on—NCR has incurred and documented for AT&T

16

over $223 million in Kzoo River remediation costs to date, well over the $100 million threshold. More than $165 million of those costs (again, excluding any Cravath legal fees) was billed to AT&T before it sent its July Demand. (*See id*. ¶¶ 78-80.) Critically, neither AT&T's July Demand nor its January 2026 Escalation Notice contests the reasonableness of the supporting information provided for these *non*-Cravath costs. (*See id.* ¶¶ 56-57, 71.)

*Third*, AT&T's refusal to make payments on the current Kzoo Remediation Invoices, and its indefinite "pausing" of future payments, is a material and unexcused breach of its obligations under Sections 6.3 and 9.9 of the SDA.

Pursuant to Section 6.3 of the SDA, AT&T "shall" reimburse NCR for 37% of Exclusive NCR Contingent Liabilities (in excess of the previously met $100 million threshold), which includes Kzoo remediation costs. Even though AT&T complied with that obligation for years, the current Kzoo Remediation Invoices remain past due, and AT&T has stated unequivocally that it is "pausing" all future payments until AT&T, in its sole discretion, determines that NCR has made a "good faith counter" to its demand. (*See id.* ¶¶ 83-85.) That is breach, plain and simple.

AT&T next attempts to excuse its breach by arguing that it has merely "proposed" to "pause" payments of Kzoo River invoices such that no repudiation of its obligations under the SDA has occurred. (*Id.* ¶ 69.) But this was not a mere "proposal"; AT&T has in fact ceased payment, and refuses to resume payment unless NCR capitulates to its demands and agrees to write off past costs from future invoices. That *is* repudiation. *See REA Express, Inc. v. Interway Corp.*, 538 F.2d 953, 955 (2d Cir. 1976) ("Under New York law, insistence upon terms which are not contained in a contract constitutes an anticipatory repudiation thereof."). Regardless, AT&T's failure to remit payment on the outstanding Kzoo Remediation Invoices itself is a material breach. *See Fifty States Mgmt. Corp. v. Pioneer Auto Parks, Inc.*, 46 N.Y. 2d 573, 575

17

(N.Y. 1979) (finding defendant in material breach of contract for "failing to tender payment of two monthly rental payments").

AT&T's refusal to make payments on Kzoo Remediation Invoices is also a breach of Section 9.9 of the SDA. Even if AT&T believed in good faith that it had overpaid on Past Invoices (a proposition NCR very much doubts), self-help in the form of withholding payment on current and future invoices is expressly barred by Section 9.9. Rather, in the event of a dispute under the SDA, the Parties must continue to "honor all *other* commitments under this Agreement . . . during the course of dispute resolution pursuant to the provisions of this Article IX [Arbitration; Dispute Resolution] with respect to all matters not subject to such dispute, controversy or claim." (SDA § 9.9 (emphasis added).) The Kzoo Remediation Invoices that AT&T suddenly refuses to pay do not include *any* of the Past Disputed Costs. (Compl. ¶ 87.) AT&T's refusal to make payment on these invoices pending resolution of the Past Disputed Costs is a blatant breach of Section 9.9.

Further, even with respect to the disputed Cravath legal fees (which, again, have nothing to do with the Kzoo Remediation Invoices at issue here), AT&T has no basis to withhold payment. The SDA clearly provides: "It shall not be a defense to any obligation by any party to pay any amount in respect to any Excess Portion . . . *that such party does not approve of the quality or manner of the defense thereof*." (SDA § 6.3(e) (emphasis added).) In other words, the SDA prohibits AT&T from second-guessing the legal fees that NCR incurred in defending itself (and AT&T, as its indemnitor) from billions of dollars in liability.

*Fourth*, NCR has already suffered damages as a direct result of AT&T's breach. The outstanding Kzoo Remediation Invoices total just over $8 million, with interest continuing to accrue each day. (Compl. ¶ 89.) Those damages will continue to grow rapidly as NCR continues to remediate the Kzoo River, as it must do under the Kzoo River Consent Decree. (*Id.*)

18

Because NCR has shown a likelihood of success on the breach elements, including material breach, it is entitled to specific performance. The Parties already agreed, in negotiating the SDA, that specific performance is the appropriate remedy for any breach or threatened breach, waiving any argument to the contrary. (SDA § 12.13.) In such circumstances, courts in this Circuit presume that specific performance is an appropriate remedy. *See Wells Fargo Bank N.A. v. Bank of Am., N.A.*, 2013 WL 372149, at \*8 (S.D.N.Y. Jan. 31, 2013) ("When specific performance is contemplated by the contract, courts tend to find that irreparable harm would be suffered unless specific performance is granted."); *301 E. 60th St. LLC v. Competitive Sols. LLC*, 190 N.Y.S. 3d. 79, 4 (N.Y. App. Div. 2023) (explaining that a court "reviewing an agreement that provides for specific performance should accord deference to the parties' manifest intent"). The same should hold here.

**B.    At Minimum, NCR Has Established a Serious Question on the Merits Plus a Balance of Hardships in Its Favor.**

At the very least, NCR has established that it has sufficiently serious questions going to the merits of the dispute. "The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Citigroup Glob. Mkts, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). To prevail under this standard, a moving party must show "serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Id.* NCR has met that standard here.

For the reasons set forth above in Section I.A, NCR has, at minimum, put forward sufficient legal and factual assertions to present serious questions as to whether AT&T breached

19

its obligations under the SDA, and whether NCR is entitled to specific performance for that breach.  This makes NCR's breach of contract claim a "fair ground for trial," which is sufficient to support the issuance of a preliminary injunction in aid of arbitration.  *Id.* at 35; *see also Thales Avionics, Inc. v. L3 Techs., Inc.*, 719 F. Supp. 3d 337, 340 (S.D.N.Y. 2024) (granting injunctive relief in aid of arbitration where plaintiff's allegations raised a serious question as to whether defendant breached a contract).

The balance of hardships also tips decidedly in NCR's favor.  Courts routinely find this element to be met where the requested injunction "would not impose any new legal duty" on the defendant, but rather "would give necessary teeth to an existing contractual duty."  *Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 237 (S.D.N.Y. 2014); *see also Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 346 (E.D.N.Y. 2020) (granting preliminary injunction where "the Court would be enforcing contractual obligations to which the individual defendants freely agreed").  That is precisely what NCR seeks to do here:  hold AT&T to the express and unambiguous terms of the Parties' decades-old contract—pursuant to which AT&T paid what it owed until recently—at least until an arbitrator can adjudicate the merits of the dispute.

## II.    NCR IS LIKELY TO SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF.

AT&T has conceded that a breach of the SDA will cause NCR irreparable harm and has expressly waived any argument to the contrary.  That should end the inquiry as to irreparable harm.  (Section II.A.)  But even setting aside AT&T's waiver, NCR is likely to suffer actual irreparable harm because AT&T's breach is:  (i) risking a downgrade to NCR's credit rating and its ability to access capital markets to support its ongoing business operations; and (ii) endangering NCR's continued compliance with the Kzoo River Consent Decree.

(Section II.B.)  Moreover, absent this Court's intervention, NCR will experience such harm well before it has the chance to exercise its contractual right to arbitrate the merits of AT&T's breach. That constitutes an additional basis to support a finding of irreparable harm requiring this Court's protection of the status quo.  (Section II.C.)

### A.     AT&T Has Already Conceded that a Breach of Its Obligations Under the SDA Cannot Be Adequately Compensated by Money Damages.

As courts in this Circuit routinely hold, an agreement between contracting parties that a breach cannot be adequately compensated by money damages directly supports a finding of irreparable harm.  *See Benihana*, 784 F.3d at 895 (irreparable harm provision in the parties' agreement "is relevant evidence that can help support a finding of irreparable injury"); *Intertek Testing Servs.*, 443 F. Supp. at 332 (E.D.N.Y. 2020) (contract provision acknowledging that "violation [of a contract] would cause plaintiff irreparable harm entitling it to injunctive relief[] further supports a finding of irreparable harm"); *see also Bank of Am., N.A. v. PSW NYC LLC*, 918 N.Y.S. 2d 396 (N.Y. Sup. Ct. 2010) (finding irreparable harm and issuing preliminary injunction where contract provided that "monetary damages are not an adequate remedy to redress a breach . . . and that a breach by any party hereunder would cause irreparable harm"). Such a finding is warranted here, where the Parties expressly agreed that "remedies at law for *any* breach or threatened breach, *including monetary damages*, are inadequate compensation for *any* loss."  (SDA § 12.13 (emphases added).)

In fact, the Parties' agreement here is even stronger.  AT&T not only agreed that a breach of any of its obligations under the SDA would cause NCR irreparable harm; it also expressly waived any argument to the contrary:  "any defense in any action for specific performance that a remedy at law would be adequate is waived."  (*Id.*)  To the extent AT&T intends to argue NCR is unlikely to suffer irreparable harm from its intentional breach, AT&T is estopped from doing so.

21

AT&T is a sophisticated party that, in case of the SDA, controlled the drafting, as it was "negotiating" with its then-wholly owned subsidiary.  AT&T should not be allowed to raise arguments it has expressly waived in an agreement AT&T itself drafted.  *See James River Grp.*, 224 N.Y.S. 3d at 11-12 & n.22 (citing to contractual provision providing that breach will cause irreparable harm and waiving any defense that there is an adequate remedy of law, and finding that "[c]ourts enforce such provisions when negotiated by sophisticated counsel"); *Colonial Sur.*, 2009 WL 2440307 at *4-5 (rejecting defendants' argument that plaintiff failed to demonstrate irreparable harm in light of contractual provision stipulating that harm would be irreparable and waiving defenses to specific performance).

      **B.**      **AT&T's Breach Threatens Irreparable Harm to NCR's Financial Health, Ongoing Business Operations and Regulatory Compliance.**

Even if the Parties had not contractually agreed that the harm here is irreparable (which they did), and even if AT&T was not estopped from arguing otherwise (which it is), it is clear that NCR will suffer such harm here, absent injunctive relief.  NCR relies on AT&T's continued performance under the SDA to satisfy its ongoing remedial obligations under the Kzoo River Consent Decree.  If AT&T's intentional withholding of its SDA obligations continues, it will substantially risk impairing NCR's ongoing business operations and financial health, thereby risking its ability to access capital markets, successfully complete its business transition, as well as its ability to comply with the Kzoo River Consent Decree, thereby damaging NCR's reputation and goodwill with regulators and investors alike.

To start, absent this Court's intervention, NCR is likely to suffer irreparable harm because it cannot shoulder AT&T's share of NCR's ongoing obligations under the Kzoo River Consent Decree without risk of impairing its ongoing business operations and financial health. (Compl. ¶ 94.)  As AT&T is keenly aware, NCR is at a key inflection point as it transitions

towards providing platform-led software and services, an industry that is fast-evolving and highly competitive.  (*Id.* ¶ 95.)  This transition has been, and continues to be, capital-intensive. Since 2023, NCR has spent hundreds of millions of dollars in transformation and restructuring costs alone.  (*Id.*)  It continues to incur annual research and development costs in excess of $100 million to keep pace with technological advancements and remain competitive with its peers.  (*Id.*)

All told, in 2024 and through September 2025, NCR's adjusted free cash flows—*i.e.*, the metric that NCR uses to assess how much cash it has on hand to invest in ongoing operations, engage in strategic acquisitions, or pay down its debt obligations—was negative by tens of millions of dollars.  (*Id.* ¶ 96.)  NCR evaluates on a daily basis whether it has sufficient cash on hand to satisfy its current operating costs consistent with this strategy, or whether it will need to draw on its revolving credit facility ("Revolver"), which is intended to provide a safety net for managing temporary cash flow gaps and unexpected expenses related to NCR's ongoing business operations.  (*Id.* ¶ 97.)  As such, unexpected costs that NCR may not have considered material a few years ago now threaten the overall financial health of the company.  (*Id.*)

The risk that NCR will need to draw down on its Revolver to address legacy liabilities is not theoretical; it is the reality.  Subsequent to AT&T's suspension of its payment obligations, NCR has needed to draw on its Revolver, including to cover the over $8 million attributable to AT&T's breach.  (*Id.* ¶ 98.)  If AT&T continues its ongoing breach, NCR risks needing to draw down that Revolver in increasing amounts, taking on increased debt at high interest rates, and leaving less of the Revolver available for ongoing business operations and related contingencies. (*Id.*)

Drawing down on the Revolver to address legacy liabilities—for businesses that NCR no longer operates and that AT&T is contractually obligated to indemnify—not only reduces the

23

availability of the Revolver capacity for operational needs, but also risks negatively impacting NCR's ability to access capital markets at this critical inflection point. (*Id.* ¶ 100.) In June 2025, for example, the credit rating agency Fitch assigned NCR a credit rating score of "BB," with the *key assumption* that NCR would be able to decrease its debt-to-EBITDA ratio from 3.8x to closer to 3.0x by year-end. (*Id.* ¶ 102.) A "BB" credit rating is already a "below investment grade" rating, which exposes NCR to high interest rates and signals to investors an elevated risk of default. (*Id.* ¶ 103.) Increased utilization of its Revolver capacity by NCR to meet AT&T's share of the Kzoo River remediation costs increases NCR's debt position, and further risks a credit rating downgrade. (*Id.*)

This, in turn, also risks harming NCR's attractiveness to investors. (*Id.* ¶ 104.) More than half of NCR's $1.1 billion in outstanding debt obligations, *plus* any amounts NCR draws from its Revolver (plus interest), come due in 2028. (*Id.* ¶ 105.) NCR will need to begin efforts to refinance this debt well before year-end. (*Id.*) By that time, NCR's leverage ratio will have increased, and the harm will already have been inflicted, meaning that NCR risks being unable to refinance or restructure its debt on favorable terms (if at all). (*Id.*) Such harms cannot be adequately compensated through money damages alone, as the Parties recognized when they entered into the SDA. *See Painewebber, Inc. v. Nwogugu*, 1998 WL 545327, at *7 (S.D.N.Y. Aug. 26, 1998) (finding "no adequate remedy at law" where defendant's filing of statements asserting a security interest in plaintiff company "could harm [plaintiff's] credit rating and undermine the confidence of present and future customers and credits" because "[t]he extent of these damages are incalculable").

NCR cannot unilaterally "pause" remediation work to avoid these harms. If NCR stopped or slowed work due to funding issues caused by AT&T, it risks government sanctions. (Compl. ¶ 108.) Given that the governments' covenants to refrain from suing NCR or take

administrative action against it "are conditioned upon the satisfactory performance by [NCR] of its obligations under [the Consent Decree]" (*id.*), falling behind on obligations could have significant consequences for NCR.  *See Bancroft Life & CasICC, Ltd. v. Intercontinental Mgmt. Ltd.*, 456 Fed. App'x 184, 188, 190 (3d Cir. 2012) (upholding finding of irreparable harm where defendant's alleged wrongful conduct—withholding certain records—interfered with plaintiff's ability to comply with applicable insurance laws, subjecting the plaintiff to the threat of enforcement action).

Even setting aside the possibility of sanctions, NCR's prospective inability to satisfy its obligations under the Kzoo River Consent Decree threatens to erode its goodwill with its regulators.  NCR has spent decades working to build and strengthen its relationships with its regulators, including the EPA and the relevant state agencies, in connection with the remediation efforts along the Kzoo and Fox Rivers.  (Compl. ¶ 109.)  These regulators wield vast discretion over what NCR must do to comply with its remediation obligations and on what timeline; and they decide whether NCR has satisfactorily performed its obligations.  (*Id.*)  By jeopardizing NCR's compliance, AT&T's ongoing breach risks eroding the goodwill that NCR has worked for decades to establish.  (*Id.*)  Courts recognize such loss of goodwill as irreparable harm sufficient to warrant a preliminary injunction.  *See Novotech (Austl.) PTY Ltd. v. SureClinical Inc.*, 2022 WL 17419168, at *4 (E.D. Cal. Dec. 2, 2022) (finding irreparable harm when plaintiff "has sufficiently alleged damage to . . . its reputation and goodwill with clients and federal regulators").

### C.    NCR's Loss of Its Contractual Right to Meaningfully Arbitrate This Dispute Is Also Irreparable Harm.

The fact that these harms likely will materialize before NCR has the opportunity to arbitrate this dispute is itself irreparable harm justifying this Court's intervention.

25

This Court has recognized that "the loss of the right to have a dispute decided by arbitration when arbitration is the agreed upon means of resolution is itself irreparable injury." *Thales Avionics*, 719 F. Supp. 3d at 347. For example, in *Credit Suisse Sec. (USA) LLC v. Ebling*, the plaintiff sought a preliminary injunction to preserve the status quo pending arbitration. 2006 WL 3457693, at *3 (S.D.N.Y. Nov. 27, 2006). In evaluating irreparable harm, the district court concluded that, without a preliminary injunction, "the harm that Petitioner seeks to address via arbitration will occur *before* the arbitrator can render a decision, and Petitioner will lose its right to meaningfully resolve these [] disputes via arbitration." *Id.* at *3 (emphasis added). That fact alone, the Court held, "constitutes irreparable harm." *Id.*

So too here. Without a preliminary injunction, NCR may be forced to divert additional sums away from its business operations as soon as next month, when Invoice No. Kzoo-13 comes due. (Compl. ¶ 110.) The near-term threat to NCR's credit rating and ability to access capital markets would also likely come to pass well before this dispute can be resolved via arbitration. (*See id.*) That is irreparable harm.

## III.   A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST.

The public interest strongly supports granting the requested preliminary injunction for several reasons:

*First*, the public interest is served by NCR's continued ability to support critical environmental work on the Kzoo River, for the benefit of the public. This court has underscored the importance of environmental concerns in granting injunctive relief. *See Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 697 (S.D.N.Y. 2025) (granting preliminary injunction against federal agencies finding, in relevant part, that the demonstrated environmental benefits of the plan at issue supported finding that the injunction was in the public interest).

*Second*, "[t]he public has an interest in seeing that parties oblige by their contractual obligations and are not allowed to skirt such obligations at another's expense." *Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*, 754. F. Supp. 2d 616, 626 (S.D.N.Y. 2010). "In general, public policy holds competent contracting parties to bargains made by them freely and voluntarily, and requires the courts to enforce such agreements." *Id.* (quoting *Cuciniello v. Cuciniello*, 378 N.Y.S. 2d 976, 977 (N.Y. Sup. Ct. 1976)). That is all NCR seeks to do here: hold AT&T to the Parties' decades-old bargain, one that AT&T complied with for many years.

*Third*, the public interest is served where a preliminary injunction would ensure that the arbitration process is not made a "hollow formality." *Bionpharma*, 582 F. Supp. 3d at 174. AT&T's breach continues to "alter irreversibly the status quo before the arbitrators are able to render a decision in the dispute." *Id.* Issuance of a preliminary injunction not only helps to limit irreparable harm to the injured party, but also supports "the well-established federal public policy in favor of arbitration." *Thales Avionics*, 719 F. Supp. 3d at 349 (quoting *Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 410 (2d Cir. 2009)).

By contrast, there is no public interest served by AT&T's position that it should continue to sit on millions of dollars it owes under a long-standing contract and that would otherwise be put to good use remediating environmental harm.

## CONCLUSION

For the foregoing reasons, NCR respectfully requests that the Court issue a preliminary injunction requiring AT&T to perform its obligations under the SDA by timely paying all due invoices through the pendency of the dispute resolution process.

27

DATED:  January 30, 2026

Respectfully submitted,

By:   */s/ Yonatan Even*

**CRAVATH, SWAINE & MOORE LLP**
Yonatan Even
yeven@cravath.com
Vanessa A. Lavely
vlavely@cravath.com
Helam Gebremariam
hgebremariam@cravath.com
Katherine A. DuBois
kdubois@cravath.com

Two Manhattan West
375 Ninth Avenue
New York, New York 10001
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff*
*NCR VOYIX Corporation*

28

### CERTIFICATE OF WORD COUNT COMPLIANCE

Pursuant to local Civil Rule 7.1(c), I certify under penalty of perjury that the foregoing

Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction contains

8656 words, excluding items exempted by local Civil Rule 7.1(c).  In making this certification I

have relied upon the word count of Microsoft Word, the word-processing system used to prepare

the memorandum.


DATED: January 30, 2026

                                                Respectfully submitted,

                                                By:   */s/ Yonatan Even*

                                                **CRAVATH, SWAINE & MOORE LLP**
                                                Yonatan Even
                                                yeven@cravath.com
                                                Vanessa A. Lavely
                                                vlavely@cravath.com
                                                Helam Gebremariam
                                                hgebremariam@cravath.com
                                                Katherine A. DuBois
                                                kdubois@cravath.com


                                                Two Manhattan West
                                                375 Ninth Avenue
                                                New York, New York 10001
                                                Telephone:  (212) 474-1000
                                                Facsimile:  (212) 474-3700

                                                *Attorneys for Plaintiff*
                                                *NCR VOYIX Corporation*

29