UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NCR VOYIX CORPORATION<br><br>     *Plaintiff,*<br>v.<br><br>AT&T ENTERPRISES, LLC,<br>f/k/a AT&T CORP.<br><br><br>     *Defendant.* | Case No. 26-cv-00848-DEH |

**DEFENDANT AT&T ENTERPRISES, LLC'S MEMORANDUM OF
LAW IN OPPOSITION TO PLAINTIFF NCR VOYIX
<u>CORPORATION'S MOTION FOR A PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

**Page(s)**

PRELIMINARY STATEMENT ................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................................... 3

    A.    NCR's environmental liability stems from pollution of the Fox and Kalamazoo Rivers from the 1950s through 1971. ...................................................................................... 3

    B.    AT&T acquired and then spun off NCR's predecessor company in the 1990s ...................... 3

    C.    The SDA limits AT&T's reimbursement obligations to "reasonably incurred" attorneys' fees and expenses with "reasonable supporting information." ...................................................... 4

    D.    The SDA limits the Court's authority to temporary restraining orders and establishes procedures for interim relief pending arbitration. ................................................................. 4

    E.    AT&T meets its SDA obligations for NCR's Fox River liability while belatedly receiving detailed documentation for Cravath fees and expenses. ........................................................ 5

    F.    NCR has failed to provide reasonable supporting documentation for $66 million in Cravath fees in connection with NCR's Kalamazoo River liability. .................................................... 6

    G.    AT&T seeks to resolve the parties' disputes. ....................................................................... 8

    H.    NCR initiates arbitration for the same dispute at issue in this action. ................................. 10

LEGAL STANDARD ................................................................................................................ 10

ARGUMENT ............................................................................................................................. 11

    I.    NCR has failed to establish it will suffer irreparable harm absent a preliminary injunction .. 11

    A.    NCR's claims of financial distress and loss of goodwill are speculative and contradicted by the record. ............................................................................................................................. 12

    B.    NCR's alleged injury is compensable in monetary damages, and the SDA cannot save NCR's unsupported claims of irreparable harm. ............................................................................. 16

    C.    NCR has not lost, and will not lose, its right to arbitrate this dispute. ................................. 18

    II.    NCR is unlikely to succeed on the merits. .......................................................................... 19

    A.    NCR's failure to provide "reasonable supporting information" for the Disputed Cravath Invoices is a breach of the SDA. ......................................................................................... 20

    B.    NCR has failed to establish that Cravath's legal expenses were "reasonably incurred" as required by the SDA. ............................................................................................................ 21

    C.    AT&T has complied with its payment obligations under the SDA. ...................................... 22

    III.    NCR's requested injunction would be contrary to the public interest and inequitable. ........ 24

CONCLUSION .......................................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alpha Cap. Anstalt v. Shiftpixy, Inc.*,
432 F.Supp.3d 326 (S.D.N.Y. 2020)........................................................................................ 14, 18

*Awosting Reserve LLC v. Chaffin/Light Assocs. Co.*,
296 F.Supp.2d 470 (S.D.N.Y. 2003)......................................................................12, 17, 19

*AXMS Corp. v. Friedman*,
948 F.Supp.2d 319 (S.D.N.Y. 2013).......................................................................................17

*Bancroft Life & Casualty ICC, Ltd. v. Intercontinental Management Ltd.*,
456 F.App'x 184 (3d Cir. 2012)............................................................................................16

*Benihana, Inc. v. Benihana of Tokyo, LLC,*
784 F.3d 887 (2d. Cir. 2015).................................................................................................18

*Beyond Gravity Sweden AB v. Ensign-Bickford Aerospace & Defense Co.*,
No. 24-cv-2021 (OAW), 2025 WL 540468 (D. Conn. Feb. 19, 2025)................................24

*Borey v. Nat'l Union Fire Ins. Co.*,
934 F.2d 30 (2d Cir. 1991) ....................................................................................................12

*Coaction Specialty Mgmt. Co. v. eMaxx Ins. Servs., LLC*,
25-cv-7815 (VSB), 2025 WL 3718475 (S.D.N.Y. Dec. 23, 2025) ............................... 16, 21

*Credit Suisse Secs. (USA) LLC v. Ebling*,
No. 06-cv-11339 (RCC), 2006 WL 3457693 (S.D.N.Y. Nov. 27, 2006)........................19

*Curtis v. Cenlar FSB*,
654 F.App'x 17 (2d Cir. 2016).............................................................................................12

*Datapak Assocs., Inc. v. Hoynash*,
No. 04-cv-5731 (RCC), 2004 WL 2290507 (S.D.N.Y. Oct. 8, 2004) ...............................12

*Digital Ally, Inc. v. Culp McAuley, Inc.*,
No. 22-cv-02203-HLT-ADM, 2022 WL 2390194 (D. Kan. July 1, 2022) .....................12

*Esses v. Rosen*,
24-cv-3605 (RPK) (CLP), 2024 WL 4494086 (E.D.N.Y. Oct. 15, 2024) ................. 19, 20

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
559 F.3d 110 (2d Cir. 2009) .................................................................................................11

*FEI Hong Kong Co. Ltd. v. GlobalFoundries, Inc.*,
   No. 20-cv-02342-MKV, 2020 WL 1444956 (S.D.N.Y. Mar. 25, 2020) ............................... 17

*Firemen's Ins. Co. of Newark, New Jersey v. Keating*,
   753 F.Supp. 1146 (S.D.N.Y. 1990) ......................................................................... 18

*Gen. Transp. Servs., Inc. v. Kemper Ins. Co.*,
   No. 03-cv-620, 2003 WL 21703635 (N.D.N.Y. June 25, 2003) ........................................ 15

*GPA Inc. v. Liggett Group, Inc.*,
   862 F.Supp. 1062 (S.D.N.Y. 1994) ......................................................................... 15

*Great Earth Intern. Franchising Corp. v. Milks Development, Inc.*,
   302 F.Supp.2d 248 (S.D.N.Y. 2004) ....................................................................... 11

*Hanson Trust PLC v. SCM Corp.*,
   774 F.2d 47 (2d Cir. 1985) ..................................................................................... 3

*Hertzoff v. Diaz*,
   No. 07-cv-3157 (CM)(MHD), 2007 WL 9819264 (S.D.N.Y. Aug. 13, 2007) ................................ 21

*In re Keurig Green Mountain Single-serve Coffee Antitrust Litig.*,
   No. 14-MD-2542 (VSB), 2014 WL 12778832 (S.D.N.Y. Sept. 19, 2014), *aff'd*, 618
   F.App'x 31 (2d Cir. 2015) ...................................................................................... 12

*In re M.B. Int'l W.W.L.*,
   No. 12 CIV. 4945(DLC), 2012 WL 3195761 (S.D.N.Y. Aug. 6, 2012) ............................... 17

*Ivy Mar Co. v. C.R. Seasons Ltd.*,
   907 F.Supp. 547 (E.D.N.Y. 1995) .......................................................................... 15

*JTH Tax, LLC v. Agnant*,
   62 F.4th 658 (2d Cir. 2023) .......................................................................... 12, 17

*Mastrovincenzo v. City of New York*,
   435 F.3d 78 (2d Cir. 2006) ................................................................................ 10

*Metro Funding Corp. v. WestLB AG*,
   No. 10-cv-1382(CM), 2010 WL 1050315 (S.D.N.Y. Mar. 19, 2010) .................................. 21

*Mitsubishi Power Sys., Inc. v. Shaw Grp., Inc.*,
   No. 04-cv-1251 (RMB), 2004 WL 527047 (S.D.N.Y. Mar. 16, 2004) ................................ 13

*Nano Dimension Ltd. v. Murchinson Ltd.*,
   681 F.Supp.3d 168 (S.D.N.Y. 2023) ..................................................................... 12

*New York v. U.S. Dep't of Educ.*,
   477 F.Supp.3d 279 (S.D.N.Y. 2020) ................................................................ 10, 24

*Novotech (Austl.) PTY Ltd. v. SureClinical Inc.,*
   No. 22-cv-01259-JAM-AC, 2002 WL 17419168 (E.D. Cal. Dec. 5, 2022) ......................................16

*Painwebber, Inc v. Nwogugu,*
   No. 98-cv-2441 (DLC), 1998 WL 545327 (S.D.N.Y. Aug. 26, 1998) ..............................................17

*Rodriguez ex rel. Rodriguez v. DeBuono,*
   175 F.3d 227 (2d Cir. 1999) .......................................................................................................11

*Salinger v. Colting,*
   607 F.3d 68 (2d Cir. 2010) ................................................................................................ 11, 16

*New York ex rel. Schneiderman v. Actavis PLC,*
   787 F.3d 638 (2d Cir. 2015) .......................................................................................................10

*St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.,*
   131 F.4th 102 (2d Cir. 2025)........................................................................................... 11, 14, 16

*Starbucks Corp. v. McKinney,*
   602 U.S. 339 (2024).....................................................................................................................19

*Students for Fair Admissions v. U.S. Mil. Acad. at W. Point,*
   709 F.Supp.3d 118 (S.D.N.Y. 2024)............................................................................................10

*Vantico Holdings S.A. v. Apollo Mgmt., LP,*
   247 F.Supp.2d 437 (S.D.N.Y. 2003).............................................................................................15

iv

## PRELIMINARY STATEMENT

Plaintiff NCR Voyix Corporation ("NCR") asks this Court to issue a preliminary injunction—an "extreme," "extraordinary," and "drastic" remedy—based on a run-of-the-mill contract dispute between sophisticated parties involving a purely monetary claim based on a Separation and Distribution Agreement from 1996 (the "SDA") and environmental liabilities that spring solely from NCR's legacy business and conduct. And NCR seeks this relief despite NCR not presenting *any* legitimate evidence that it will suffer irreparable harm, despite NCR failing to perform its own obligations under the SDA, and despite AT&T Enterprises, LLC ("AT&T") having the contractual right to dispute the reasonableness of Cravath attorneys' fees and costs at issue here. For those reasons, and all those described further below, NCR's motion should be denied.

First, NCR has not made a "clear showing" that it will suffer irreparable harm on this record, which contains only NCR's verified complaint. NCR's claims of irreparable injury are speculative, inconsistent, and limited to slightly delayed payment of the disputed funds. NCR is a large public company with a market capitalization of nearly $1.3 billion that faces no imminent decline in financial or reputational health; NCR's claim that delayed payment of the disputed funds, only about $8 million of which was allegedly past due at the time of NCR's motion, will inflict such alleged financial calamity is both unsupported and implausible. Notably, NCR did not warn its investors that non-payment of the disputed funds could materially impact NCR's business in any way, despite mentioning this dispute in its recent SEC filing when generally describing its ongoing environmental liabilities. And, most obviously, NCR's relief—payment of the disputed funds—is by definition a concrete injury remediable by monetary damages and thus cannot be "irreparable" under Second Circuit law.

Second, NCR is unlikely to succeed on the merits. NCR's breach of contract claim is fatally flawed because NCR failed to comply with its own contractual obligation to provide AT&T with "reasonable supporting information" for $66 million in disputed Cravath fees and costs. Indeed, NCR

1

refused to provide anything more than single-paragraph block billed invoices, despite AT&T's repeated requests and despite NCR previously providing AT&T with tens of thousands of pages of Cravath time entries and other supporting documentation during a related dispute under the SDA. That history confirms NCR's obligation and ability to comply—and underscores the unreasonableness of expecting AT&T to reimburse millions in Cravath fees based solely on single-paragraph invoices. But NCR's claim fails for an additional, independent reason: AT&T has no obligation to reimburse NCR for the disputed Cravath attorneys' fees and costs because NCR has not established they were "reasonably incurred" as required under the SDA. Given both NCR's failure to provide reasonable supporting information *and* the existence of independent evidence suggesting Cravath's billing practices were unreasonable, NCR's claim is unlikely to succeed.

Finally, issuing a preliminary injunction would disserve the public interest and the equities. The parties agreed to arbitrate this dispute under rules that empower *an arbitrator* to issue emergency relief. In fact, NCR has already commenced arbitration and should seek any interim relief in those proceedings. Overriding the agreed arbitral process to prejudge the merits of the parties' dispute— and thus disregarding the strong presumption of arbitration codified in the Federal Arbitration Act— would harm the public's reliance on arbitration provisions and existing law. For the same reasons, the equities weigh in AT&T's favor. AT&T bargained for and relied on the SDA's provisions requiring arbitration absent truly exigent circumstances not present here. The equitable path is for NCR to seek interim relief in its already-initiated arbitration—not force AT&T to act through rushed and unnecessary federal court intervention and then unscramble the eggs later.

In short, NCR has not come close to meeting its burden for obtaining "one of the most drastic tools in the arsenal of judicial remedies[.]" *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985).[1]

## FACTUAL BACKGROUND

**A.      NCR's environmental liability stems from pollution of the Fox and Kalamazoo Rivers from the 1950s through 1971.**

Pursuant to Consent Decrees entered in 2017 and 2019, NCR is required to perform remediation work to remove polychlorinated biphenyls ("PCBs") from the Fox and Kalamazoo Rivers. (Compl. ¶¶ 36-37.)[2] NCR's liability relates to its predecessor's production and sale of paper product containing PCBs, which was allegedly disposed of and released into the Fox and Kalamazoo Rivers. This conduct began in the 1950s and continued until 1971, when NCR's predecessor stopped using PCBs in its paper product, and therefore concluded long before AT&T acquired NCR in 1991. (Ex. 1 at ¶¶ 45-54; Ex. 2 at ¶ 7.a.iv.; Ex. 3 at ¶¶ 29-30.)[3]

**B.      AT&T acquired and then spun off NCR's predecessor company in the 1990s.**

In 1991, AT&T acquired NCR's predecessor company, National Cash Register Corp. ("NCR Corp."). (Compl. ¶ 18.) On February 1, 1996, long before the extent of NCR's environmental liability for the Fox and Kalamazoo Rivers was known, NCR Corp., AT&T, and Lucent Technologies Inc., now Nokia of America Corporation, entered into a Separation and Distribution Agreement to form

---

[1] NCR is represented by Cravath, Swaine and Moore LLP ("Cravath") in this action—the same law firm whose unreasonable billing practices are the subject of the parties' dispute.  Accordingly, AT&T reserves its rights to seek disqualification of Cravath on the grounds that the firm is a necessary party, or any other applicable grounds, in the upcoming arbitration or any other proceeding related to the parties' dispute.

[2] Any defined terms shall have the same meaning as contained in NCR's Complaint, unless AT&T explicitly defines a term otherwise.

[3] Unless otherwise specified, the cited exhibit numbers reference exhibits attached to the Gilbert Declaration, filed contemporaneously herewith.

three independent companies. (Compl. Ex. 1 (hereinafter referred to as the "SDA")). On December 31, 1996, AT&T Corp. completely divested its ownership of NCR Corp. in a spin-off transaction. (Compl. ¶ 18.)

### C.      The SDA limits AT&T's reimbursement obligations to "reasonably incurred" attorneys' fees and expenses with "reasonable supporting information."

NCR alleges that its Kalamazoo River liability constitutes an "Exclusive Contingent Liability," and that its related costs and expenses are "Environmental Liabilities" under Section 6.1 of the SDA. (Compl. ¶¶ 19-22.) Both of those defined terms limit AT&T's reimbursement obligation to "Liabilities," which is defined as follows:

> **Liabilities** means any and all losses…including those arising under any law, rule, regulation, Action, threatened or contemplated Action (including the costs and expenses of demands, assessments, judgments, settlements and compromises relating thereto and attorneys' fees and any and all costs and expenses (including allocated costs of in-house counsel and other personnel), whatsoever *reasonably incurred in investigating, preparing or defending against any such Actions or threatened or contemplated Actions*), order or consent decree of any Governmental Authority or any award of any arbitrator or mediator of any kind…"

(SDA § 1.62 (emphasis added).)

The SDA allows NCR to seek reimbursement for AT&T's portion of costs in excess of $100 million (the "Excess Portion") in connection with Exclusive Contingent Liabilities, but only after NCR "provides an invoice (including *reasonable supporting information* with respect thereto) to the party owing such amount." (*Id.* §§ 6.3 (b), 6.5(a) (emphasis added).) Therefore, NCR's attorneys' fees and expenses must be "reasonably incurred" *and* supported by "reasonable supporting information" before AT&T's reimbursement obligation attaches under the SDA.

### D.      The SDA limits the Court's authority to temporary restraining orders and establishes procedures for interim relief pending arbitration.

NCR alleges that the Court is authorized to issue a preliminary injunction under Section 9.7 of the SDA, but that provision only permits NCR to seek "one or more *temporary restraining orders* in a

4

court of competent jurisdiction." (Compl. ¶ 26; SDA § 9.7(b).) The SDA thus limits the parties' ability to seek court-ordered interim relief to exigent circumstances requiring temporary restraining orders. The SDA separately provides procedures for seeking interim relief in less exigent circumstances, incorporating Rule 14 of the CPR Non-Administered Arbitration Rules, which allows for the appointment of an emergency arbitrator within one business day to address requests for emergency interim relief. (SDA § 9.5; Ex. 4.) Moreover, Section 9.6 of the SDA and Rule 13 of the CPR Rules permit the arbitrator to grant interim relief as appropriate pending resolution of arbitration. (SDA § 9.6 (b); CPR Rule 13.) And as NCR concedes, even absent any interim relief, the SDA requires that a final arbitration award must be issued in less than one year following an arbitration demand. (Compl. ¶ 110; SDA § 9.4.)

### E.    AT&T meets its SDA obligations for NCR's Fox River liability while belatedly receiving detailed documentation for Cravath fees and expenses.

In November 2012, NCR began invoicing AT&T for its share of Fox River costs pursuant to the SDA, including invoices for legal fees and expenses charged to NCR by Cravath. (Kruger Decl. ¶ 3.)[4] NCR initially provided only summary documentation for the Cravath invoices, such as single-page block billing descriptions for an entire month of work. (*Id.*) Beginning in December 2012, AT&T began paying the Fox River invoices despite objecting to certain charges and expressly reserving its rights. (*Id.* ¶ 4.) NCR acknowledged and agreed to AT&T's reservation of rights. (*Id.*) AT&T also began requesting reasonable supporting information for the Cravath legal fees and expenses, as required by SDA Section 6.5. (*Id.*) NCR's Fox River invoices included approximately $86 million charged by Cravath. (*Id.* ¶ 8.)

---

[4] Unless otherwise specified, "Kruger Decl." refers to the Declaration of Michael Kruger, dated February 12, 2026, and filed contemporaneously herewith.

From 2013 through 2020, AT&T repeatedly requested additional documentation supporting Cravath's legal fees and expenses. (*Id.* ¶ 5.) Those efforts resulted in NCR ultimately producing nearly 38,000 pages of supporting documentation, including Cravath's detailed time entries, cost detail reports, and supporting documentation for a subset of expenses. (*Id.* ¶ 6.) After review and analysis of that documentation, AT&T determined that a substantial portion of the Cravath legal fees were not "reasonably incurred" under the SDA due to numerous unreasonable billing practices, such as:

- Excessively high billing rates ($18.57 million delta with the billing rates of an AmLaw10 firm also utilized by NCR);
- Significant overstaffing (143 timekeepers, including 72 associates);
- Double billing between the Fox and Kalamazoo matters;
- Over 900 14+ hour billing days, including multiple instances of billing more than 24 hours in a day;
- Voluminous vague billing descriptions; and
- Over $13 million in undocumented expenses for "Other Professionals."

(Ex. 5; *see* Kruger Decl. ¶ 7.)

Despite these significant concerns, AT&T paid its share of all Fox River Invoices Nos. 1-26, for a total of $90,040,839.18, subject to the parties' agreed reservation of rights and their agreement to postpone adjudication of AT&T's disputes until the completion of the Fox River remediation. (Kruger Decl. ¶ 8.) AT&T continues to dispute the reasonableness of the $86 million in Cravath fees and expenses invoiced by NCR in connection with Fox River. That dispute, which includes additional issues beyond the reasonableness of Cravath's billing practices, is proceeding under the SDA's dispute resolution process. (Exs. 5-6.)

**F.    NCR has failed to provide reasonable supporting documentation for $66 million in Cravath fees in connection with NCR's Kalamazoo River liability.**

In March 2023, NCR issued its first invoice relating to its Kalamazoo River liability ("Kalamazoo Invoice No. 1"), which included 47 Cravath invoices amounting to roughly $66.9 million in legal fees and costs. (Kruger Decl. ¶ 9.) Just as with the Fox River invoices, AT&T did not receive "reasonable supporting information" for most of those Cravath invoices. Specifically, NCR did not

6

provide time entries or other supporting documentation for 36 of the 47 Cravath invoices included in Kalamazoo Invoice No. 1. (Kruger Decl. ¶ 10.) Those 36 Cravath invoices, totaling $66,047,976 (the "Disputed Cravath Invoices"), were only supported by monthly invoices consisting of a single block-billed entry and lists of undocumented expenses. (*Id.*; *see, e.g.*, Exs. 7-8.) AT&T's share of the $66 million in fees and costs shown on the Disputed Cravath Invoices is $18,939,257 (the "Disputed Amount"). (Kruger Decl. ¶ 14.)

Since receiving Kalamazoo Invoice No. 1, AT&T repeatedly requested reasonable supporting documentation for the $66 million in Disputed Cravath Invoices, similar to the detailed materials NCR eventually produced for the Fox River invoices. (*See, e.g.,* Exs. 9-10.) But NCR has failed to provide anything more than the 116 pages of block-billed invoices originally provided in March 2023. (Kruger Decl. ¶ 10.) This refusal is particularly unjustified given that NCR produced tens of thousands of pages of detailed time entries and supporting documentation for the Fox River Cravath invoices, yet maintains—without explanation—that single-paragraph block bills are sufficient to justify $66 million in charges related to the Kalamazoo River liability. (*See* Ex. 10.)[5]

AT&T paid Kalamazoo Invoice Nos. 1 through 10, subject to a reservation of rights agreed to by NCR, for a total of $29,718,219.50 to date for its share of the Kalamazoo River allocation—including the Disputed Amount of $18.9 million representing AT&T's share of the $66 million in Disputed Cravath Invoices shown on Invoice No. 1. (Kruger Decl. ¶ 12.) AT&T has not paid Invoice Nos. 11 through 13, which claim $56,810,119.93 in expenses incurred by NCR and seek $16,290,300.88 in reimbursement from AT&T, of which only about $8 million was past due when NCR filed its motion. (*Id.* ¶ 13.) Based on NCR's representations to AT&T, NCR expects to incur

---

[5] While AT&T has reserved its right to challenge all Kalamazoo invoices through the SDA dispute resolution process, the Cravath fees on Invoices Nos. 1 and 6 for which NCR provided supporting time entries (totaling approximately $860,000 in fees) are not at issue here.

about ███████ in costs in 2026 for remediation of the Kalamazoo River, of which AT&T's share would be about ███████. (Ex. 23 at 1-2.)

### G.    AT&T seeks to resolve the parties' disputes.

On July 23, 2025, AT&T sent a letter to NCR proposing to resolve the parties' remaining disputes regarding the Fox River and Kalamazoo River liabilities (the "July 2025 Letter"). (Ex. 5.) The letter detailed AT&T's objections to Cravath's invoices for the Fox and Kalamazoo River liabilities, including NCR's failure to provide reasonable supporting documentation and AT&T's significant concerns about Cravath's unreasonable billing practices. (*Id.*) Specifically, with respect to Cravath's $86 million in Fox River fees, AT&T itemized its objections to Cravath's excessively high billing rates, significant overstaffing, double billing across Fox and Kalamazoo matters, and several other major issues with costs and expenses, which totaled $48.3 million in disputed fees and $15.9 million in disputed costs and expenses. (*Id.*) AT&T's letter concluded with a proposal to resolve the parties' outstanding Fox and Kalamazoo disputes, including that AT&T would "pause" payment on Kalamazoo River invoices. (*Id.*)

After NCR failed to respond to the July 2025 Letter, AT&T sent an additional letter on October 21, 2025, advising NCR that AT&T will not further extend the tolling of the parties' disputes on Fox and Kalamazoo River issues, and that AT&T intends to initiate arbitration proceedings under the schedule set out in the parties' current tolling agreement. (Ex. 11 (noting February 2, 2026 deadline for escalation notices and April 3, 2026 deadline for arbitration demands).)

NCR finally responded to AT&T's July letter on November 4, 2025, (Ex. 12), and the parties met to discuss the issues on November 14, 2025. (*See* Ex. 13 at 5.) In December 2025, NCR accused AT&T of breaching the SDA based on AT&T's payment pause. (*Id.* at 1-2.) On December 8, 2025, AT&T explained it had not breached due to the absence of reasonable supporting information for the

8

$66 million in Disputed Cravath Invoices, noting that "[a] single page block bill for an entire month's work of legal fees (particularly at the six and seven figure level) is not 'reasonable.'" (*Id.*)

NCR reiterated its claim of breach on December 15, 2025, and AT&T responded via letter on December 19, 2025. (Exs. 14-15.) AT&T's letter asserted that NCR's failure to provide "reasonable supporting information" for the Disputed Cravath Invoices constitutes "breach of Section 6.5(a)" of the SDA and "nullif[ies] any AT&T payment obligation based on that $66 million." (Ex. 15 at 1.) AT&T also explained that its settlement proposal is to "pause payment of Kalamazoo invoices" as an "offset[]" for the amounts subject to dispute. (*Id.* at 2 (emphasis in original).)

On January 7, 2026, NCR sent an escalation notice to AT&T alleging breach of the SDA for AT&T's pause in paying Kalamazoo River invoices. (Ex. 16.) On January 20, 2026, AT&T sent a counter escalation notice regarding the Kalamazoo River disputes and an escalation notice regarding the Fox River disputes. (Ex 6.) On January 26, 2026, the parties met and conferred, during which AT&T proposed the parties enter mediation and asked NCR to respond to that proposal by February 6, 2026. (Kruger Decl. ¶ 16.) Instead, on January 31, 2026, NCR filed this action against AT&T, alleging that AT&T intended to halt all past due and future payments related to the Kalamazoo River liability.

On February 2, 2026, AT&T advised NCR that AT&T's pause in payment is limited to NCR incurring $66,047,976 (the amount of the Disputed Cravath Invoices), and that AT&T would resume payment of Kalamazoo invoices after NCR incurred that amount. (Ex. 17 at 2; *see* Kruger Decl. ¶ 17.) NCR has incurred $56.8 million of that $66 million. (Ex. 17 at 2.) AT&T asked NCR to reconsider its preliminary injunction filing given AT&T's intent to soon resume Kalamazoo invoice payments and proposed that the parties focus their efforts on resolving their disputes through mediation and the SDA's dispute resolution procedures. (*Id.*) On February 3, 2026, NCR rejected AT&T's proposal and stated it would not withdraw this action. (*Id.* at 1.)

9

**H.     NCR initiates arbitration for the same dispute at issue in this action.**

On February 13, 2026, NCR served a Notice of Arbitration on AT&T, commencing arbitration proceedings under the CPR Rules. (Gilbert Decl. ¶ 26.) NCR's Notice of Arbitration makes the same allegations as its Complaint in this action. (*Id.*)

## LEGAL STANDARD

A preliminary injunction is a "drastic" remedy that requires a plaintiff to demonstrate each of the following four factors: (1) it is likely to succeed on the merits; (2) it will likely suffer irreparable harm absent relief; (3) the balance of equities supports an injunction; and (4) an injunction is in the public interest. *New York v. U.S. Dep't of Educ.*, 477 F.Supp.3d 279, 293 (S.D.N.Y. 2020). "A preliminary injunction 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Students for Fair Admissions v. U.S. Mil. Acad. at W. Point*, 709 F. Supp. 3d 118, 129 (S.D.N.Y. 2024) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). "A preliminary injunction is … never awarded as of right." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (internal quotations and citation omitted). And a movant is held to an even higher standard when, as here, the injunction is "mandatory," such that the relief requested will command defendant to take a specific action like paying disputed funds. *See, e.g., Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006) (explaining that mandatory injunctions like the one requested here "alter the status quo *by commanding some positive act* ... [and] thus alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success.") (emphasis in original) (internal quotations and citation omitted). In such cases, the movant bears an even higher burden to show a "substantial" likelihood of success on the merits and a "strong showing" of irreparable harm. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).[6]

---

[6] For the reasons below, NCR's motion fails under any preliminary injunction standard articulated in this circuit. *See, e.g., Students for Fair Admissions*, 709 F.Supp.3d at 130 (explaining that the "issue of whether to apply a heightened standard is largely academic" because plaintiff's evidence

10

## ARGUMENT

### I.    NCR has failed to establish it will suffer irreparable harm absent a preliminary injunction.

To prove irreparable injury, NCR must make a "clear showing" that it will suffer actual and imminent harm that cannot be remedied with monetary damages. *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025). In this circuit, the irreparable harm requirement "is the single most important prerequisite" for a preliminary injunction and "must therefore be satisfied before the other requirements… can be considered." *Id.* (citation omitted); *see also Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233-34 (2d Cir. 1999) ("Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.") (internal quotations and citation omitted). NCR must demonstrate that it "will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotations and citation omitted). And such harm is only irreparable when "remedies … at law, such as monetary damages, are inadequate to compensate" for the harm. *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (internal quotations and citation omitted).

NCR's irreparable injury arguments fail for three reasons. First, NCR's claims of financial distress and loss of goodwill are speculative and contradicted by the record evidence. Second, given that NCR raises a garden variety contract claim for identified funds, its damages are easily and fully compensable by monetary relief. Last, because the arbitration award will be issued within a short period, NCR's claim that it will lose its right to arbitration is unfounded. Because NCR has failed to

---

could not support the "extraordinary and drastic remedy" of a preliminary injunction "regardless of the standard applied"); *Great Earth Int'l Franchising Corp. v. Milks Devs., Inc.*, 302 F.Supp.2d 248, 251 (S.D.N.Y. 2004) (denying preliminary injunction motion and explaining that such distinction is "particularly elusive in breach of contract cases" and "more semantic than substantive").

establish this critical element, the Court need not consider the remaining three factors of the preliminary injunction test. *See, e.g.*, *Awosting Reserve LLC v. Chaffin/Light Assocs. Co.*, 296 F.Supp.2d 470, 473 (S.D.N.Y. 2003) ("[A] lack of irreparable harm is sufficient to deny a preliminary injunction.").[7]

### A. NCR's claims of financial distress and loss of goodwill are speculative and contradicted by the record.

The law in the Second Circuit is clear: the "mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction." *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991). Thus, courts routinely deny preliminary injunctions where, as here, the alleged irreparable harm is speculative, conclusory, or inconsistent with other record evidence. *See, e.g.*, *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 673 (2d Cir. 2023) (preliminary injunctions require that plaintiff present "actual evidence" that its injury is "neither remote nor speculative"); *Datapak Assocs., Inc. v. Hoynash*, No. 04-cv-5731 (RCC), 2004 WL 2290507, at *2 (S.D.N.Y. Oct. 8, 2004) ("Conclusory statements are an insufficient foundation on which to find irreparable harm.") (citations omitted); *In re Keurig Green Mountain Single-serve Coffee Antitrust Litig.*, No. 14-MD-2542 (VSB), 2014 WL 12778832, at *6 (S.D.N.Y. Sept. 19, 2014) (finding alleged future decline in sales and goodwill too speculative to constitute irreparable harm), *aff'd*, 618 F.App'x 31 (2d Cir. 2015); *Nano Dimension Ltd. v. Murchinson Ltd.*, 681 F.Supp.3d 168, 193 (S.D.N.Y. 2023) (no irreparable harm where the "chronology and set of alleged facts are inconsistent with a showing of irreparable harm"). NCR's claim—that it will suffer

---

[7] NCR's allegations should be given limited weight because, in addition to not providing the Court with non-speculative evidence of irreparable harm, the "verified" allegations are made by individuals without personal knowledge who verified the allegations on mere information and belief. *See* Compl. at pp. 36, 37; *Digital Ally, Inc. v. Culp McAuley, Inc.*, No. 22-cv-02203-HLT-ADM, 2022 WL 2390194, at *10 (D. Kan. July 1, 2022) (denying preliminary injunction supported by verified complaint because "allegations based on 'information and belief' are generally insufficient to warrant injunctive relief"); *see also Curtis v. Cenlar FSB*, 654 F.App'x 17, 20-21 (2d Cir. 2016) (similarly rejecting "information and belief" allegations in verified complaint when granting defendant's motion for summary judgment).

significantly diminished financial and reputational health if it does not receive the Disputed Amount (*i.e.*, $18.9 million representing AT&T's percentage of the $66 million in Disputed Cravath Invoices) pending the parties' arbitration—is precisely the type of conclusory, speculative, and inconsistent assertion rejected by courts.

Indeed, NCR has been in existence for over 140 years (Ex. 18), and just two years ago sold one of its divisions for a purchase price of $2.45 billion. (Ex. 19.) Last year, NCR collected over $2 billion in revenues; today, NCR has a market capitalization of nearly $1.3 billion, nearly $300 million cash on hand, and a $500 million credit facility at its disposal. (Ex. 20 at 14, 22.) Similarly, by its own admission, NCR's financial condition appears to be improving, given that it decreased its negative free cash flow between the years 2024 and 2025. (Compl. ¶ 96.) Public reporting and financial analysts suggest that NCR will significantly grow its free cash flow this year, projecting nearly $205 million in 2026. (Ex. 21.) In fact, since NCR discussed this dispute in its Q3 2025 10-Q filing, investors nonetheless have targeted NCR's stock with a "buy rating" considering its financial reporting. (Ex. 22.) These facts are facially inconsistent with NCR's picture of a company that will fall into dire financial straits if it does not receive payment of the Disputed Amount (*i.e.*, $18.9 million) immediately over the next several months. *See, e.g.*, *Mitsubishi Power Sys., Inc. v. Shaw Grp., Inc.*, No. 04-cv-1251 (RMB), 2004 WL 527047, at *3-4 (S.D.N.Y. Mar. 16, 2004) (company could not show likelihood of financial calamity where it "currently reports total net equity over $833, cash and cash equivalents of nearly $108 million, access to $110 million in its credit facility, an improved debt-to-equity ratio" and its "market capitalization is approximately $700 million").[8]

---

[8] To the extent NCR argues that it will suffer harm based on AT&T's alleged "indefinite" refusal to pay newly issued Kalamazoo invoices under the SDA, that argument is baseless and again contradicted by the record evidence. For the purposes of this dispute and resolution of this motion, AT&T is only disputing payments linked to the Disputed Cravath Invoices and will resume payment on invoices not impacted by that dispute. (Ex. 17; Kruger Decl. ¶ 17.)

NCR's most recent Securities and Exchange Commission filing also undermines its claims. In its November 2025 10-Q, NCR did not disclose any specific material risks flowing from its dispute with AT&T, despite explaining that AT&T was "currently disputing the calculation" related to the Kalamazoo River project and that AT&T and NCR were "in discussion to resolve the dispute." (Ex. 20 at 27.) Nor did NCR warn investors directly that this dispute or AT&T's non-payment of the Disputed Amount could imperil NCR's credit rating or otherwise impact NCR's ability to comply with the Kalamazoo River Consent Decree. (*Id.*) Put simply, NCR knew about this dispute and the non-payment as of November 2025 yet determined it unnecessary to disclose *any* impending risks flowing directly from the dispute, much less the risks NCR imagines in its motion. These facts alone sink NCR's claim that non-payment of the Disputed Amount will cause NCR to suffer significantly diminished financial and operational health. *See, e.g.*, *Alpha Cap. Anstalt v. Shiftpixy, Inc.*, 432 F.Supp.3d 326, 334 (S.D.N.Y. 2020) (no irreparable harm where alleged claims about company's financial distress were contradicted by party's SEC filings).

But even ignoring the bevy of contradictory facts undermining NCR's claims, NCR's motion still fails because NCR relies on high-level, speculative generalities about what "could" happen, offering no specific evidence that irreparable harm is "actual and imminent." *St. Joseph's Hosp. Health Ctr.*, 131 F.4th at 106. For example, NCR quotes generalized risk factor language about abstract risks to NCR's business that "could" happen if it massively increases its debt levels. (Compl. ¶ 101.) But these risks are completely untethered to this dispute, and NCR provides no evidence to explain why temporary non-payment of the Disputed Amount of $18.9 million will immediately cause such generalized risks to materialize. NCR makes no attempt to quantify the amount of funds at issue in its dispute with AT&T or explain why delayed receipt of *that amount specifically* will somehow trigger the parade of horribles imagined in its motion. Similarly, NCR's generic claim that it *could* exceed the leverage ratio required by its credit agreements is unavailing. That NCR's credit agreements require a

14

leverage ratio—a typical requirement for businesses employing debt financing—is unsurprising and on its own irrelevant. NCR fails—indeed, does not even try—to prove that non-payment of the Disputed Amount (or any amount of Kalamazoo invoices) specifically would impact its leverage ratio materially, much less beyond an acceptable measure. *See* V*antico Holdings S.A. v. Apollo Mgmt., LP*, 247 F.Supp.2d 437, 453 (S.D.N.Y. 2003) (rejecting preliminary injunction because "the evidence does not show that Vantico's cash balances will imminently fall below the necessary threshold as a result of actions engaged in by [defendant]"); *Ivy Mar Co. v. C.R. Seasons Ltd.*, 907 F.Supp. 547, 565 (E.D.N.Y. 1995) (rejecting irreparable harm because party did not present any "financial statements or any reliable figures" supporting its irreparable injury claims).

At bottom, NCR asks the Court to imagine that (1) non-payment of a limited set of invoices over a short, months-long period until arbitration concludes somehow *could* (2) cause NCR to incur an unsustainable amount of debt, which in turn somehow *could* (3) cause the company to flounder and suffer a reduction in its credit rating, which in turn somehow *could* (4) so diminish NCR's goodwill that the investment community turns its back on NCR. That daisy chain of hypotheticals—none of which is supported by specific facts explaining why payment of the *Disputed Amount specifically* is so essential to NCR's day-to-day operations over the next several months—is simply too speculative for NCR to carry its high burden under the law of this circuit. *See, e.g., GPA Inc. v. Liggett Grp., Inc.*, 862 F.Supp. 1062, 1069-70 (S.D.N.Y. 1994) (no irreparable harm where "possible" insolvency was not established by the record); *Ivy Mar Co.*, 907 F.Supp. at 564  (denying preliminary injunction because one should not issue "upon a plaintiff's imaginative, worst case scenario of the consequences"); *Gen. Transp. Servs., Inc. v. Kemper Ins. Co.*, No. 03-cv-620, 2003 WL 21703635, at *2-3 (N.D.N.Y. June 25, 2003) (explaining that a downgrade of company's credit rating was insufficient to suggest imminent danger of insolvency or sufficiently significant financial harm).

For the same reason, NCR's claim that it "could" lose goodwill with its regulators, (Mot. at 23-25), is also speculative and unavailing. NCR again has not demonstrated that withholding payment of the Disputed Amount of $18.9 million will impact NCR's remediation efforts at all, much less prevent NCR from continuing its remediation obligations or invite regulatory scrutiny. These claims are simply unsupported by any real record evidence. *See, e.g., Coaction Specialty Mgmt. Co. v. eMaxx Ins. Servs., LLC*, 25-cv-7815 (VSB), 2025 WL 3718475, at *7 (S.D.N.Y. Dec. 23, 2025) ("generalized damage to reputation falls short of irreparable injury") (internal quotations and citation omitted).[9]

### B. NCR's alleged injury is compensable in monetary damages, and the SDA cannot save NCR's unsupported claims of irreparable harm.

As explained above, NCR cannot credibly claim that it is unable to withstand non-payment of the Disputed Amount of $18.9 million (only about $8 million of which was past due when NCR filed its motion) for, at most, a months-long period pending arbitration. NCR therefore has failed to make the required "clear showing" that it will suffer an actual and imminent injury that cannot be remedied with monetary damages. *St. Joseph's Hosp. Health Ctr.*, 131 F.4th at 106; *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (explaining that irreparable injury exists only when "remedies … at law, such as monetary damages, are inadequate to compensate" for the harm) (citation omitted). That failure is dispositive here, where NCR asserts nothing more than a garden-variety contract claim seeking payment of identified funds with easily calculable damages. *See Awosting Reserve LLC*, 296 F.Supp.2d

---

[9] NCR's out-of-circuit cases are inapposite. In *Bancroft Life & Casualty ICC, Ltd. v. Intercontinental Management Ltd.*, after defendant refused to return proprietary customer records to the insurance company plaintiff, plaintiff's regulator specifically threatened legal action if the records were not secured. 456 F.App'x 184, 188 (3d Cir. 2012). The record is devoid of *any specific evidence* that this dispute will cause NCR to be unable to comply with its consent decrees or perform its regulatory obligations; certainly, NCR's regulator has not made a specific threat of legal action as in *Bancroft*. In *Novotech (Austl.) PTY Ltd. v. SureClinical Inc.*, the defendant expelled plaintiff from the defendant's pharmaceutical clinical trial platform, which immediately would have torpedoed in-process clinical trials, threatened patient safety, created legal liability for plaintiff, and harmed efforts to secure approval for pharmaceuticals undergoing clinical trials. No. 22-cv-01259-JAM-AC, 2002 WL 17419168, at *4 (E.D. Cal. Dec. 5, 2022). No similar actual and imminent injury has been shown here.

16

at 473 ("It is clear that the parties are engaged in a contractual dispute over funds Awosting claims it has the right to control…The Court fails to see how an award of money damages would not adequately compensate Awosting should these issues be decided in its favor."); *FEI Hong Kong Co. Ltd. v. GlobalFoundries, Inc.*, No. 20-cv-02342-MKV, 2020 WL 1444956, at *3 (S.D.N.Y. Mar. 25, 2020) (rejecting preliminary injunction in contract case where "the roadmap to recovery…seems straightforward" because the allegations, if proven, "give rise to a claim for breach of contract compensable by money damages").[10]

NCR attempts to sidestep the irreparable harm requirement by invoking language from the SDA stating the parties may seek specific performance and other equitable relief. (Mot. at 21.) But this contractual provision does not, standing alone, establish irreparable harm under the law of this circuit. *See, e.g., AXMS Corp. v. Friedman*, 948 F.Supp.2d 319, 337-38 (S.D.N.Y. 2013) ("[I]t is well-settled in the Second Circuit that 'contractual language declaring money damages inadequate in the event of a breach *does not* control the question of whether preliminary injunctive relief is appropriate…the Court must perform a standard inquiry into the existence of irreparable injury'") (citations omitted). Accordingly, courts in this district recognize that such provisions *are not dispositive* and must be coupled with independent, non-speculative evidence of irreparable injury to sustain the high showing required for a preliminary injunction. *See, e.g., In re M.B. Int'l W.W.L.,* No. 12 CIV. 4945(DLC), 2012 WL 3195761, at *12 (S.D.N.Y. Aug. 6, 2012) (explaining that, even when presented with such contractual provisions, "the Court remains obliged to make an independent determination as to whether injunctive relief is appropriate"); *JTH Tax, LLC,* 62 F.4th at 674 (denying preliminary injunction

---

[10] NCR's reliance on *Painwebber, Inc v. Nwogugu*, No. 98-cv-2441 (DLC), 1998 WL 545327 (S.D.N.Y. Aug. 26, 1998)—the only case it cites for its financial harm argument—is unavailing. There, the plaintiff challenged a *$1.9 billion* debt, implicating damages "so substantial that it is unlikely that [defendant] would be able to pay the judgment." *Id.* at *2. Here, the Disputed Amount pales in comparison, and NCR cannot argue that AT&T is unable to pay it.

because "such clauses…'do not control the question of whether preliminary relief is appropriate'") (citations omitted); *Alpha Cap. Anstalt*, 432 F. Supp. 3d at 334-35 ( "the parties' contractual agreement that [] breach of the Note will cause irreparable harm is insufficient alone, and instead merely one factor to consider, in assessing irreparable harm."). Here, because NCR has offered no specific evidence supporting its irreparable injury theories, the SDA's language cannot alone demonstrate a "clear showing" of irreparable injury.[11]

NCR thus reaches to reframe its argument in terms of "waiver." (Mot. at 21-22.) NCR's argument is precluded by controlling law and the clear text of the SDA. NCR's argument ignores the Second Circuit's rule that "the parties to a contract cannot, by including certain language in that contract, create a right to injunctive relief where it would otherwise be inappropriate." *Firemen's Ins. Co. of Newark, New Jersey v. Keating,* 753 F.Supp. 1146, 1154 (S.D.N.Y. 1990). Allowing litigants to evade this black letter law on "waiver" grounds would swallow the decades-old rule that has governed in this circuit. Moreover, because the SDA provision cited by NCR (§ 12.13) applies only to "any action for specific performance"—an equitable remedy granted on the merits after a fully arbitrated proceeding—it has no bearing on this motion seeking preliminary injunctive relief.

## C.   NCR has not lost, and will not lose, its right to arbitrate this dispute.

NCR's contention that it will be unable to meaningfully arbitrate this dispute is specious. As explained above, NCR offers no evidence that it faces imminent insolvency, collapse, or other circumstances that would prevent its claims from being fully heard and resolved through the parties' agreed arbitration procedures. Indeed, as NCR concedes, the SDA requires an arbitration award in

---

[11] NCR's own cases make clear that contractual provisions like the SDA's are not "controlling" or sufficient on their own to make a showing of irreparable harm. *See Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 896 (2d. Cir. 2015). NCR's cases are also factually inapplicable. For example, in *Benihana*, the court affirmed the preliminary injunction because the defendant "failed to contest the sufficiency of the evidence supporting irreparable harm[.]" *Id.* at 897.

less than a year's time from NCR's recently-served arbitration demand—and very likely significantly earlier. (SDA § 9.4; Compl. ¶ 110.) Moreover, the SDA allows NCR to seek interim relief from the appointed arbitrator pending resolution of the arbitration, and even incorporates procedures for appointment of an emergency arbitrator within one business day to grant emergency interim relief where warranted. (SDA §§ 9.5, 9.6(b); Ex. 4.) Thus, there is no impediment to NCR presenting these arguments in arbitration—the contractually designed forum for this dispute—should it so choose. NCR's only cited authority, *Credit Suisse Secs. (USA) LLC v. Ebling*, No. 06-cv-11339 (RCC), 2006 WL 3457693 (S.D.N.Y. Nov. 27, 2006), is inapposite. There, Credit Suisse sued a former employee who immediately after his resignation began violating his non-solicitation obligations by soliciting Credit Suisse clients and employees. *Id.* at 3. Thus, absent the requested injunction, the misconduct would cause irreversible "losses of clients, employees, and goodwill" that could not be remedied after the fact. *Id.* No such irreversible injury or urgency is present here.

## II.     NCR is unlikely to succeed on the merits.

While the Court need not reach this factor given NCR's abject failure to demonstrate irreparable harm, *Awosting Reserve LLC*, 296 F.Supp. at 473 ("a lack of irreparable harm is sufficient to deny a preliminary injunction"), NCR's motion fails for the independent reason that NCR is unlikely to succeed on the merits. As an initial matter, NCR's attempt to apply a lower "serious question" standard to this element is incorrect and ignores recent Supreme Court precedent. The Supreme Court held in *Starbucks Corp. v. McKinney* that courts must apply the "default rule," codified by Rule 65 of the Federal Rules of Civil Procedure, requiring plaintiffs to satisfy the traditional four-factor test when seeking preliminary injunctions under traditional equitable relief principles like those invoked here. 602 U.S. 339, 346 (2024). Following *McKinney*, courts in this circuit have acknowledged that the outdated, lower "serious question" standard should not apply to routine contract claims like this one where there is no statutory basis to apply a lower standard. *See, e.g.*, *Esses v. Rosen*, 24-cv-3605 (RPK)

19

(CLP), 2024 WL 4494086, at *2-3 (E.D.N.Y. Oct. 15, 2024) (explaining that "in *McKinney*, the Supreme Court directed that 'absent a clear command from Congress, courts must adhere to the traditional four-factor test' in deciding whether to grant a preliminary injunction" and that "it is difficult to see how [the serious question] standard survives *McKinney*") (citations omitted).

In any event, NCR fails under either standard because AT&T is likely to succeed on the merits for the following reasons: (i) NCR did not comply with its obligation under the SDA to provide AT&T with reasonable supporting information for the Disputed Cravath Invoices, (ii) NCR has failed to establish that Cravath's legal expenses were reasonably incurred, and (iii) AT&T therefore has both a contractual and evidentiary basis to withhold payment for the Disputed Amount. Each of NCR's arguments to the contrary is unsupported by both the controlling language of the SDA and the factual record.

## A.  NCR's failure to provide "reasonable supporting information" for the Disputed Cravath Invoices is a breach of the SDA.

As an initial matter, Section 6.5 of the SDA is unambiguous that AT&T has no obligation to reimburse NCR until "promptly *after* [NCR] provides an invoice (*including reasonable supporting information with respect thereto*) to [AT&T]." (SDA § 6.5(a) (emphasis added).) NCR cannot plausibly dispute that this obligation exists, both in light of the SDA's plain language and NCR's own prior course of conduct. The SDA makes clear that AT&T's obligation to reimburse NCR for attorneys' fees extends only to attorneys' fees that were reasonably incurred. (SDA § 1.62.). NCR's contrary reading—that it need not provide reasonable supporting information with its invoices—would strip this operative language of meaning. Absent supporting information, AT&T would have no ability to assess whether the invoiced fees were reasonable at all. Because NCR's interpretation would render multiple contractual provisions meaningless, it is untenable as a matter of basic contract law.

Moreover, NCR's prior course of conduct independently confirms NCR has—and knows it has—this contractual obligation to provide reasonable supporting information. Indeed, when made

aware of this threshold obligation after submitting deficient invoices for the Fox River liability, NCR responded by providing AT&T with significant additional supporting information for $86 million in Cravath fees. (Kruger Decl. ¶¶ 5-6.) Specifically, NCR provided nearly 38,000 pages of supporting documentation, including but not limited to Cravath's detailed time entries, cost detail reports, and supporting documentation for certain expenses. (*Id.*) Here, by contrast, NCR has refused to even attempt to satisfy the same contractual condition precedent in connection with the $66 million in Disputed Cravath Invoices, despite AT&T invoking the identical SDA provision. NCR's failure to comply with this express prerequisite to payment fatally undermines the viability of its claims and precludes any showing of a likelihood of success on this limited record. *See* Mot. at 16 (conceding NCR must demonstrate "adequate performance of the contract by the plaintiff" as an element of its claim); *see also Coaction Specialty Mgmt. Co.*, 2025 WL 3718475, at *6 (addressing similar payment-related dispute between contract counterparties and denying preliminary injunction because, as here, defendants "argue that Plaintiffs violated the express terms of the parties' agreement"); *Metro Funding Corp. v. WestLB AG*, No. 10-cv-1382(CM), 2010 WL 1050315, at *18 (S.D.N.Y. Mar. 19, 2010) (denying preliminary injunction based on breach of contract claim because plaintiff "violated [its] reporting obligation" under the parties' contract and thus was "in no position to invoke it"); *Hertzoff v. Diaz*, No. 07-cv-3157 (CM)(MHD), 2007 WL 9819264, at *18 (S.D.N.Y. Aug. 13, 2007) (denying preliminary injunction despite evidence defendant violated a non-compete obligation in part due to evidence of "defendants' alleged breaches of the contract").

### B. NCR has failed to establish that Cravath's legal expenses were "reasonably incurred" as required by the SDA.

NCR is unlikely to succeed for the additional reason that it cannot establish the reasonableness of the $66 million in Cravath fees at issue. The SDA requires that, with respect to attorneys' fees and costs, AT&T must reimburse NCR only when they were reasonably incurred. (SDA § 1.62.) Consistent with this requirement, within the definition of "Liabilities," the SDA includes "*attorneys' fees and any and*

21

*all costs and expenses* (including allocated costs of in-house counsel and other personnel), whatsoever *reasonably incurred* in investigating, preparing or defending" any relevant action. (*Id.*) The SDA is thus unambiguous: AT&T's obligation to reimburse NCR for any "Liabilities," including an "Exclusive Contingent Liability" like the Kalamazoo River liability at issue here, includes only those attorneys' fees, costs, and expenses that were reasonably incurred.

Here, as AT&T has repeatedly informed NCR, AT&T cannot assess the reasonableness of the $66 million in Disputed Cravath Invoices because NCR has provided only block-billed invoices that lack sufficient detail. (Exs. 9, 13.) AT&T is forced to assume that Cravath engaged in the same unreasonable billing practices in connection with the Kalamazoo River liability as it did with the Fox River liability. Cravath's Fox River invoices are replete with errors, unjustified expense items, and reflect Cravath's excessive staffing and billing practices. (Ex. 5 at 3.) These defects are so widespread that a legal fees expert and legal invoice auditing firm identified significant deficiencies affecting approximately 75% of the Cravath Fox invoices, including $48.3 million in disputed fees and $15.9 million in disputed costs and expenses out of a total invoiced amount of $86 million. (*See id.* at 2.).[12]

## C. AT&T has complied with its payment obligations under the SDA.

Third, NCR is unlikely to succeed on the merits because, after removing the $66 million in Disputed Cravath Invoices from the total incurred amount for the Kalamazoo River liability, AT&T has already paid NCR *in full* for all other invoices presently due under the SDA. As of today, AT&T has paid NCR $29,718,219.50 in connection with the Kalamazoo River liability, despite being obligated to pay only $10,778,962.28 once the Disputed Cravath Invoices are excluded from the total incurred amount. (Kruger Decl. ¶¶ 12-15.) In other words, AT&T has effectively *pre-paid*

---

[12] As AT&T informed NCR in its July 23, 2025 letter, AT&T is likely to prevail in obtaining a substantial adjustment (i.e., more than 60%) to the prior Cravath Fox River Invoices under the governing law applicable to attorney fee disputes. (*Id.* at 3.) AT&T expects at least the same or similar rate of recovery in connection with the Disputed Cravath Invoices. (*Id.*)

22

$18,939,257.22 (i.e., the Disputed Amount) worth of NCR invoices. At the time of NCR's preliminary injunction filing, only $8 million in NCR invoices were past due and a total of $16.3 million had been invoiced against AT&T's $18.9 million pre-payment. And based on NCR's own projections showing that AT&T is expected to owe NCR only ████████ for *all* of 2026 for NCR's projected Kalamazoo remediation costs, AT&T already has pre-paid NCR for a substantial portion of the remaining invoices expected this year. (Ex. 23 at 1-2.)

NCR's arguments to the contrary—which hang on misreadings of the SDA—are unavailing. For one, NCR incorrectly claims that AT&T cannot withhold payment of the Disputed Amount, or apply an offset when calculating amounts owed under the SDA, because AT&T is not entitled to employ "self-help" under Section 9.9 of the SDA. (Mot. at 18.) But NCR misunderstands the critical limiting language at the end of that provision:

> Unless otherwise agreed in writing, the parties will continue to provide service and honor all other commitments under this Agreement and each Ancillary Agreement during the course of dispute resolution pursuant to the provisions of this Article IX with respect to all matters *not subject to such dispute, controversy or claim.*

(SDA § 9.9 (emphasis added).)  Here, because NCR seeks to force AT&T to pay funds that are central to this dispute, it cannot rely on Section 9.9 of the SDA. To the contrary, Section 9.9 permits exactly what AT&T has done here: withholding payment on the Disputed Amount pending resolution of arbitration.

NCR's reliance on Section 6.3(e) of the SDA, (Mot. at 17), fares no better. That provision requires that AT&T must reimburse NCR even if AT&T was not consulted on or disagreed with the conduct or quality of NCR's defense. But, as explained above, AT&T is not challenging Cravath's substantive strategy for NCR's defense; it is challenging $66 million in Cravath Kalamazoo fees and expenses on grounds that they were neither *reasonably incurred* nor disclosed with *reasonable supporting information.* Because the SDA makes clear that AT&T must reimburse these Cravath expenses only if

23

they were reasonably incurred and reasonably documented (SDA §§ 1.62, 6.5(a)), and that AT&T need not pay the Disputed Amount pending the parties' dispute (SDA § 9.9), NCR's claims are unlikely to succeed on the merits.

### III.    NCR's requested injunction would be contrary to the public interest and inequitable.

Finally, NCR has failed to establish the final two threshold requirements that an injunction is (i) in the public interest; and (ii) supported by the balance of equities. *U.S. Dep't of Educ.*, 477 F. Supp. 3d at 293.

For one, this *entire dispute* is arbitrable and should be heard by an arbitrator. NCR does not and cannot dispute that its claims are fully arbitrable given that it already commenced arbitration, and the SDA allows NCR to seek in those proceedings the interim relief it is requesting here. Moreover, the SDA explicitly restricts court-ordered, out-of-arbitration relief to temporary restraining orders only. (SDA § 9.4 ("Prior to the time at which an arbitrator is appointed pursuant to Section 9.4, any party may seek one or more *temporary restraining orders* in a court of competent jurisdiction if necessary…") (emphasis added).) Because NCR has not sought such relief here, its motion is not permitted under Section 9.4 and, instead, should be decided in arbitration as the SDA requires. In sum, granting NCR's motion would be contrary to the parties' intent to arbitrate, and thus contrary to the Congressional mandate to resolve disputes in favor of arbitration.

The public interest thus strongly favors denying NCR's request and adhering to the well-established presumption of arbitrability embodied in the Federal Arbitration Act. *See, e.g.*, *Beyond Gravity Sweden AB v. Ensign-Bickford Aerospace & Defense Co.*, No. 24-cv-2021 (OAW), 2025 WL 540468, at *9 (D. Conn. Feb. 19, 2025) (denying preliminary injunction because "[a]ll that the Court is being asked to do is to enforce the parties' bargained-for right to arbitrate any disputes" and finding the public interest is served by compelling the parties to arbitration) (citations omitted). The public has no interest in converting ordinary payment disagreements into matters for extraordinary equitable

24

relief, particularly where the contract provides a clear and expedited mechanism for resolving disputes. To the contrary, the public interest is served by requiring the parties to follow their agreed procedures and by reserving injunctive relief for truly exceptional circumstances—none of which is present here.

The balance of the equities likewise weighs in AT&T's favor for the same reasons discussed above: the parties agreed to arbitrate this dispute and AT&T should not be subject to rushed federal court relief, which could prejudge the merits of the parties' arbitration and burden AT&T by forcing it to later unwind the effects of NCR's requested injunction. NCR's abbreviated argument that the equities tip in its favor because it asks the Court to enforce "express and unambiguous" contract terms, (Mot. at 20), is wrong. NCR again ignores the significant factual and legal issues undercutting its claims, *supra* pp. 19-23, and that it already initiated arbitration for its plainly arbitrable claims. *Supra* p. 10.

## **CONCLUSION**

NCR seeks extraordinary relief without meeting the extraordinary burden required. Because NCR fails to establish any of the elements required for an injunction, AT&T respectfully requests that the Court deny NCR's motion in its entirety.

Date: February 17, 2026

Respectfully submitted,

By: */s/ Sarah Gilbert*

Sarah Gilbert
Luke Taeschler
Emily Werkmann
**Crowell & Moring LLP**
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Tel: (212) 895-4226
sgilbert@crowell.com
ltaeschler@crowell.com
ewerkmann@crowell.com

*Attorneys for Defendant AT&T Enterprises, LLC*

26

## CERTIFICATE OF WORD COUNT COMPLIANCE

Pursuant to local Civil Rule 7.1(c), I hereby certify under penalty of perjury that the foregoing Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction contains 8,575 words, excluding items are exempted by local Civil Rule 7.1(c). In making this certification, I have relied upon the word count of Microsoft Word, the word-processing system used to prepare the memorandum.

DATED: February 17, 2026

By: */s/ Sarah Gilbert*
**Crowell & Moring LLP**
Sarah Gilbert
Luke Taeschler
Emily Werkmann
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Tel: (212) 895-4226
sgilbert@crowell.com
ltaeschler@crowell.com
ewerkmann@crowell.com

*Attorneys for Defendant AT&T Enterprises, LLC*